# MERRION ET AL., DBA MERRION & BAYLESS, ET AL. *v.* JICARILLA APACHE TRIBE ET AL.

No. 80–11.   Argued March 30, 1981—Reargued November 4, 1981— Decided January 25, 1982*

*Together with No. 80–15, *Amoco Production Co. et al.* v. *Jicarilla Apache Tribe et al.*, also on certiorari to the same court.

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 159.

*Jason W. Kellahin* reargued the cause for the petitioners in No. 80–11. With him on the briefs were *Bruce D. Black, Thomas H. Burton*, and *John Wimbish*. *John R. Cooney* reargued the cause for petitioners in No. 80–15. With him on the briefs were *Mark B. Thompson III, John H. Pickering, Samuel A. Stern, R. H. Landt*, and *Richard L. Marlar*.

*Deputy Solicitor General Claiborne* reargued the cause for respondent Secretary of the Interior in both cases. With him on the brief on reargument were *Acting Solicitor General Wallace* and *Assistant Attorney General Dinkins*. With him on the brief on the original argument were *Solicitor General McCree, Acting Assistant Attorney General Liotta, Edwin S. Kneedler, Jacques B. Gelin*, and *Martin W. Matzen*. *Robert J. Nordhaus* reargued the cause for respondents Jicarilla Apache Tribe et al. in both cases. With him on the briefs were *B. Reid Haltom* and *Terry D. Farmer.*†

---

†Briefs of *amici curiae* urging reversal were filed by *Helena S. Maclay, Deirdre Boggs*, and *Bruce McEvoy*, Special Assistant Attorneys General, for the State of Montana; by *Bruce L. Herr, John B. Draper, Allen I.*

JUSTICE MARSHALL delivered the opinion of the Court.

Pursuant to long-term leases with the Jicarilla Apache Tribe, petitioners, 21 lessees, extract and produce oil and gas from the Tribe's reservation lands. In these two consolidated cases, petitioners challenge an ordinance enacted by the Tribe imposing a severance tax on "any oil and natural gas severed, saved and removed from Tribal lands." See Oil and Gas Severance Tax No. 77-0-02, App. 38. We granted certiorari to determine whether the Tribe has the authority to impose this tax, and, if so, whether the tax imposed by the Tribe violates the Commerce Clause.

I

The Jicarilla Apache Tribe resides on a reservation in northwestern New Mexico. Established by Executive Order in 1887,[1] the reservation contains 742,315 acres, all of which are held as tribal trust property. The 1887 Executive

---

*Olson*, Attorney General of North Dakota, *Albert R. Hausauer*, Special Assistant Attorney General, *Robert B. Hansen*, Attorney General of Utah, *Richard L. Dewsnup* and *Michael Quealy*, Assistant Attorneys General, *John D. Troughton*, Attorney General of Wyoming, and *Ron Arnold*, Assistant Attorney General, for the States of New Mexico et al.; by *Slade Gorton*, Attorney General, and *Timothy Malone*, Assistant Attorney General, for the State of Washington; by *James G. Watt* and *William H. Mellor III* for the Mountain States Legal Foundation; by *Frederick J. Martone* for the Salt River Project Agricultural Improvement and Power District et al.; by *Edward L. Barrett, Jr., Richard C. Cahoon, Dennis McCarthy*, and *Arthur H. Nielsen*, for Shell Oil Co. et al.; and by *George J. Miller* for Westmoreland Resources, Inc.

Briefs of *amici curiae* urging affirmance were filed by *Harry R. Sachse, Reid Peyton Chambers, Charles A. Hobbs, Robert A. Warden, Lawrence White*, and *Steven S. Anderson* for the Council of Energy Resource Tribes et al.; and by *George P. Vlassis* for the Navajo Tribe of Indians.

[1] See 1 C. Kappler, Indian Affairs, Laws and Treaties 875 (1904) (Order of President Cleveland). Two earlier Orders setting aside land for the Tribe had been canceled. See *id.*, at 874–875 (Orders of Presidents Hayes and Grant). The boundaries of the reservation were redefined or clarified by Executive Orders issued by President Theodore Roosevelt on Novem-

Order set aside public lands in the Territory of New Mexico for the use and occupation of the Jicarilla Apache Indians, and contained no special restrictions except for a provision protecting pre-existing rights of bona fide settlers.[2] Approximately 2,100 individuals live on the reservation, with the majority residing in the town of Dulce, N. M., near the Colorado border.

The Tribe is organized under the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*, which authorizes any tribe residing on a reservation to adopt a constitution and bylaws, subject to the approval of the Secretary of the Interior (Secretary).[3] The Tribe's first Constitution, approved by the Secretary on August 4, 1937, preserved all powers conferred by § 16 of the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 987, 25 U. S. C. § 476. In 1968, the Tribe revised its Constitution to specify:

> "The inherent powers of the Jicarilla Apache Tribe, including those conferred by Section 16 of the Act of June 18, 1934 (48 Stat. 984), as amended, shall vest in the tribal council and shall be exercised thereby subject only to limitations imposed by the Constitution of the United States, applicable Federal statutes and regulations of

ber 11, 1907, and January 28, 1908, and by President Taft on February 17, 1912. See 3 C. Kappler, Indian Affairs, Laws and Treaties 681, 682, 684, . 685 (1913).

The fact that the Jicarilla Apache Reservation was established by Executive Order rather than by treaty or statute does not affect our analysis; the Tribe's sovereign power is not affected by the manner in which its reservation was created. *E. g., Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134 (1980).

[2] The proviso reads as follows: "this order shall not be so construed as to deprive any bona fide settler of any valid rights he may have acquired under the law of the United States providing for the disposition of the public domain." 1 Kappler, *supra,* at 875.

[3] The Tribe is also chartered under the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 988, 25 U. S. C. § 477, which permits the Secretary to issue to an Indian tribe a charter of incorporation that may give the tribe the power to purchase, manage, operate, and dispose of its property.

the Department of the Interior, and the restrictions established by this revised constitution." Revised Constitution of the Jicarilla Apache Tribe, Art. XI, § 1.

The Revised Constitution provides that "[t]he tribal council may enact ordinances to govern the development of tribal lands and other resources," Art. XI, § 1(a)(3). It further provides that "[t]he tribal council may levy and collect taxes and fees on tribal members, and may enact ordinances, subject to approval by the Secretary of the Interior, to impose taxes and fees on non-members of the tribe doing business on the reservation," Art. XI, § 1(e). The Revised Constitution was approved by the Secretary on February 13, 1969.

To develop tribal lands, the Tribe has executed mineral leases encompassing some 69% of the reservation land. Beginning in 1953, the petitioners entered into leases with the Tribe. The Commissioner of Indian Affairs, on behalf of the Secretary, approved these leases, as required by the Act of May 11, 1938, ch. 198, 52 Stat. 347, 25 U. S. C. §§ 396a–396g (1938 Act). In exchange for a cash bonus, royalties, and rents, the typical lease grants the lessee "the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and natural gas deposits in or under" the leased land for as long as the minerals are produced in paying quantities. App. 22. Petitioners may use oil and gas in developing the lease without incurring the royalty. Id., at 24. In addition, the Tribe reserves the rights to use gas without charge for any of its buildings on the leased land, and to take its royalties in kind. Id., at 27–28. Petitioners' activities on the leased land have been subject to taxes imposed by the State of New Mexico on oil and gas severance and on oil and gas production equipment. Id., at 129. See Act of Mar. 3, 1927, ch. 299, § 3, 44 Stat. 1347, 25 U. S. C. § 398c (permitting state taxation of mineral production on Indian reservations) (1927 Act).

Pursuant to its Revised Constitution, the Tribal Council adopted an ordinance imposing a severance tax on oil and gas

production on tribal land. See App. 38. The ordinance was approved by the Secretary, through the Acting Director of the Bureau of Indian Affairs, on December 23, 1976. The tax applies to "any oil and natural gas severed, saved and removed from Tribal lands . . . ." *Ibid.* The tax is assessed at the wellhead at $0.05 per million Btu's of gas produced and $0.29 per barrel of crude oil or condensate produced on the reservation, and it is due at the time of severance. *Id.*, at 38–39. Oil and gas consumed by the lessees to develop their leases or received by the Tribe as in-kind royalty payments are exempted from the tax. *Ibid.;* Brief for Respondent Jicarilla Apache Tribe 59, n. 42.

In two separate actions, petitioners sought to enjoin enforcement of the tax by either the tribal authorities or the Secretary. The United States District Court for the District of New Mexico consolidated the cases, granted other lessees leave to intervene, and permanently enjoined enforcement of the tax. The District Court ruled that the Tribe lacked the authority to impose the tax, that only state and local authorities had the power to tax oil and gas production on Indian reservations, and that the tax violated the Commerce Clause.

The United States Court of Appeals for the Tenth Circuit, sitting en banc, reversed. 617 F. 2d 537 (1980).[4] The Court of Appeals reasoned that the taxing power is an inherent attribute of tribal sovereignty that has not been divested by any treaty or Act of Congress, including the 1927 Act, 25 U. S. C. § 398c. The court also found no Commerce Clause violation. We granted certioriari, 449 U. S. 820 (1980), and we now affirm the decision of the Court of Appeals.

## II

Petitioners argue, and the dissent agrees, that an Indian tribe's authority to tax non-Indians who do business on the

---

[4] Two judges dissented. Both argued that tribal sovereignty does not encompass the power to tax non-Indian lessees, 617 F. 2d, at 551–556 (Seth, C. J., dissenting); *id.*, at 556–565 (Barrett, J., dissenting) (also arguing the tax violates the Commerce Clause).

reservation stems exclusively from its power to exclude such persons from tribal lands. Because the Tribe did not initially condition the leases upon the payment of a severance tax, petitioners assert that the Tribe is without authority to impose such a tax at a later time. We disagree with the premise that the power to tax derives only from the power to exclude. Even if that premise is accepted, however, we disagree with the conclusion that the Tribe lacks the power to impose the severance tax.

### A

In *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134 (1980) *(Colville)*, we addressed the Indian tribes' authority to impose taxes on non-Indians doing business on the reservation. We held that "[t]he power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status." *Id.*, at 152. The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for its essential services. The power does not derive solely from the Indian tribe's power to exclude non-Indians from tribal lands. Instead, it derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction. See, *e. g.*, *Gibbons* v. *Ogden*, 9 Wheat. 1, 199 (1824).

The petitioners avail themselves of the "substantial privilege of carrying on business" on the reservation. *Mobil Oil Corp.* v. *Commissioner of Taxes*, 445 U. S. 425, 437 (1980); *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444–445 (1940). They benefit from the provision of police protection and other governmental services, as well as from "'the ad-

138

vantages of a civilized society'" that are assured by the existence of tribal government. *Exxon Corp.* v. *Wisconsin Dept. of Revenue*, 447 U. S. 207, 228 (1980) (quoting *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 445 (1979)). Numerous other governmental entities levy a general revenue tax similar to that imposed by the Jicarilla Tribe when they provide comparable services. Under these circumstances, there is nothing exceptional in requiring petitioners to contribute through taxes to the general cost of tribal government.[5] Cf. *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609, 624–629 (1981); *id.*, at 647 (BLACKMUN, J., dissenting); *Mobil Oil Corp.* v. *Commissioner of Taxes, supra*, at 436–437.

As we observed in *Colville, supra*, the tribe's interest in levying taxes on nonmembers to raise "revenues for essential governmental programs . . . is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services." 447 U. S., at 156–157. This surely is the case here. The mere fact that the government imposing the tax also enjoys rents and royalties as the lessor of the mineral lands does not undermine the government's authority to impose the tax. See *infra*, at 145–148. The royalty payments from the mineral leases are paid to the Tribe in its role as partner in petitioners' commercial venture. The severance tax, in contrast, is petitioners' contribution "to the general cost of providing governmental services." *Commonwealth Edison Co.* v. *Montana, supra*, at 623. State governments commonly receive both royalty payments and severance taxes from lessees of mineral lands within their borders.

---

[5] Through various Acts governing Indian tribes, Congress has expressed the purpose of "fostering tribal self-government." *Colville*, 447 U. S., at 155. We agree with Judge McKay's observation that "[i]t simply does not make sense to expect the tribes to carry out municipal functions approved and mandated by Congress without being able to exercise at least minimal

Viewing the taxing power of Indian tribes as an essential instrument of self-government and territorial management has been a shared assumption of all three branches of the Federal Government. Cf. *Colville, supra*, at 153. In *Colville*, the Court relied in part on a 1934 opinion of the Solicitor for the Department of the Interior. In this opinion, the Solicitor recognized that, in the absence of congressional action to the contrary, the tribes' sovereign power to tax "'may be exercised over members of the tribe and over nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions.'" 447 U. S., at 153 (quoting *Powers of Indian Tribes*, 55 I.D. 14, 46 (1934)). *Colville* further noted that official executive pronouncements have repeatedly recognized that "Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest . . . , including jurisdiction to tax." 447 U. S., at 152–153 (citing 23 Op. Atty. Gen. 214 (1900); 17 Op. Atty. Gen. 134 (1881); 7 Op. Atty. Gen. 174 (1855)).[6]

Similarly, Congress has acknowledged that the tribal power to tax is one of the tools necessary to self-government and territorial control. As early as 1879, the Senate Judi-

---

taxing powers, whether they take the form of real estate taxes, leasehold taxes or severance taxes." 617 F. 2d, at 550 (McKay, J., concurring).

[6] Moreover, in its revision of the classic treatise on Indian Law, the Department of the Interior advances the view that the Indian tribes' power to tax is not limited by the power to exclude. See U. S. Solicitor for Dept. of Interior, Federal Indian Law 438 (1958) ("The power to tax does not depend upon the power to remove and has been upheld where there was no power in the tribe to remove the taxpayer from the tribal jurisdiction") (footnote omitted). See also F. Cohen, Handbook of Federal Indian Law 142 (1942) ("One of the powers essential to the maintenance of any government is the power to levy taxes. That this power is an inherent attribute of tribal sovereignty which continues unless withdrawn or limited by treaty or by act of Congress is a proposition which has never been successfully disputed") (footnote omitted).

ciary Committee acknowledged the validity of a tax imposed by the Chickasaw Nation on non-Indians legitimately within its territory:

"We have considered [Indian tribes] as invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress. Subject to the supervisory control of the Federal Government, they may enact the requisite legislation to maintain peace and good order, improve their condition, establish school systems, and aid their people in their efforts to acquire the arts of civilized life; and *they undoubtedly possess the inherent right to resort to taxation to raise the necessary revenue for the accomplishment of these vitally important objects*—a right not in any sense derived from the Government of the United States." S. Rep. No. 698, 45th Cong., 3d Sess., 1–2 (1879) (emphasis added).

Thus, the views of the three federal branches of government, as well as general principles of taxation, confirm that Indian tribes enjoy authority to finance their governmental services through taxation of non-Indians who benefit from those services. Indeed, the conception of Indian sovereignty that this Court has consistently reaffirmed permits no other conclusion. As we observed in *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975), "Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations.'" They "are unique aggregations possessing attributes of sovereignty over both their members and their territory." *Ibid.* See, *e. g.*, *Worcester* v. *Georgia*, 6 Pet. 515, 557 (1832); *Iron Crow* v. *Oglala Sioux Tribe of Pine Ridge Reservation*, 231 F. 2d 89, 92, 99 (CA8 1956); *Crabtree* v. *Madden*, 54 F. 426, 428–429 (CA8 1893); Cohen, 'The Spanish Origin of Indian Rights in the Law of the United States,' in The Legal Conscience 230, 234 (L. Cohen ed.

1960). Adhering to this understanding, we conclude that the Tribe's authority to tax non-Indians who conduct business on the reservation does not simply derive from the Tribe's power to exclude such persons, but is an inherent power necessary to tribal self-government and territorial management.

Of course, the Tribe's authority to tax nonmembers is subject to constraints not imposed on other governmental entities: the Federal Government can take away this power, and the Tribe must obtain the approval of the Secretary before any tax on nonmembers can take effect. These additional constraints minimize potential concern that Indian tribes will exercise the power to tax in an unfair or unprincipled manner, and ensure that any exercise of the tribal power to tax will be consistent with national policies.

We are not persuaded by the dissent's attempt to limit an Indian tribe's authority to tax non-Indians by asserting that its only source is the tribe's power to exclude such persons from tribal lands. Limiting the tribes' authority to tax in this manner contradicts the conception that Indian tribes are domestic, dependent nations, as well as the common understanding that the sovereign taxing power is a tool for raising revenue necessary to cover the costs of government.

Nor are we persuaded by the dissent that three early decisions upholding tribal power to tax nonmembers support this limitation. *Post*, at 175–183, discussing *Morris* v. *Hitchcock*, 194 U. S. 384 (1904); *Buster* v. *Wright*, 135 F. 947 (CA8 1905), appeal dism'd, 203 U. S. 599 (1906); *Maxey* v. *Wright*, 3 Ind. T. 243, 247–250, 54 S. W. 807, 809 (Ct. App. Ind. T.), aff'd, 105 F. 1003 (CA8 1900). In discussing these cases, the dissent correctly notes that a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands, and that this power provides a basis for tribal authority to tax. None of these cases, however, establishes that the authority to tax derives *solely* from the power to exclude. Instead, these cases demonstrate that a tribe has the power to tax nonmembers only to the extent the nonmember enjoys the

privilege of trade or other activity on the reservation to which the tribe can attach a tax. This limitation on tribal taxing authority exists not because the tribe has the power to exclude nonmembers, but because the limited authority that a tribe may exercise over nonmembers does not arise until the nonmember enters the tribal jurisdiction. We do not question that there is a significant territorial component to tribal power: a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe. However, we do not believe that this territorial component to Indian taxing power, which is discussed in these early cases, means that the tribal authority to tax derives solely from the tribe's power to exclude nonmembers from tribal lands.

*Morris* v. *Hitchcock*, for example, suggests that the taxing power is a legitimate instrument for raising revenue, and that a tribe may exercise this power over non-Indians who receive privileges from the tribe, such as the right to trade on Indian land. In *Morris*, the Court approved a tax on cattle grazing and relied in part on a Report to the Senate by the Committee on the Judiciary, which found no legal defect in previous tribal tax legislation having "a twofold object—to prevent the intrusion of unauthorized persons into the territory of the Chickasaw Nation, and *to raise revenue*." 194 U. S., at 389 (emphasis added). In *Maxey* v. *Wright*, the question of Indian sovereignty was not even raised: the decision turned on the construction of a treaty denying the Tribe any governing or jurisdictional authority over nonmembers. 3 Ind. T., at 247–248, 54 S. W., at 809.[7]

---

[7] The governing treaty in *Maxey* v. *Wright* restricted the tribal right of self-government and jurisdiction to members of the Creek or Seminole Tribes. The court relied, at least in part, on opinions of the Attorney General interpreting this treaty. For example, one such opinion stated that, whatever the meaning of the clause limiting to tribal members the Tribes' unrestricted rights of self-government and jurisdiction, it did

" 'not limit the right of these tribes to pass upon the question, who . . . shall

Finally, the decision in *Buster* v. *Wright* actually undermines the theory that the tribes' taxing authority derives solely from the power to exclude non-Indians from tribal lands. Under this theory, a non-Indian who establishes lawful presence in Indian territory could avoid paying a tribal tax by claiming that no residual portion of the power to exclude supports the tax. This result was explicitly rejected in *Buster* v. *Wright*. In *Buster*, deeds to individual lots in Indian territory had been granted to non-Indian residents, and cities and towns had been incorporated. As a result, Congress had expressly prohibited the Tribe from removing these non-Indian residents. Even though the ownership of land and the creation of local governments by non-Indians established their legitimate presence on Indian land, the court held that the Tribe retained its power to tax. The court concluded that "[n]either the United States, nor a state, nor any other sovereignty loses the power to govern the people within its borders by the existence of towns and cities therein endowed with the usual powers of municipalities, *nor by the ownership nor occupancy of the land within its territorial jurisdiction by citizens or foreigners.*" 135 F., at 952 (empha-

---

share their occupancy, and upon what terms. That is a question which all private persons are allowed to decide for themselves; and even wild animals, not men, have a certain respect paid to the instinct which in this respect they share with man. The serious words "jurisdiction" and "self-government" are scarcely appropriate to the right of a hotel keeper to prescribe rules and charges for persons who become his fellow occupants.'" 3 Ind. T., at 250, 54 S. W., at 809 (quoting 18 Op. Atty. Gen. 4, 36, 37 (1884)).

The court, as well as the opinion of the Attorney General, found that the Tribes' "natural instinct" to set terms on occupancy was unaltered by the treaty. Neither the court nor the Attorney General adressed the scope of Indian sovereignty when unlimited by treaty; instead, they identified a tribe's right, as a social group, to exclude intruders and place conditions on their occupancy. The court's dependence on this reasoning hardly bears on the more general question posed here: what is the source of the Indian tribes' sovereign power to tax absent a restriction by treaty or other federal law?

sis added).[8]   This result confirms that the Tribe's authority to tax derives not from its power to exclude, but from its power to govern and to raise revenues to pay for the costs of government.

We choose not to embrace a new restriction on the extent of the tribal authority to tax, which is based on a questionable interpretation of three early cases.   Instead, based on the views of each of the federal branches, general principles of taxation, and the conception of Indian tribes as domestic, dependent nations, we conclude that the Tribe has the authority to impose a severance tax on the mining activities of petitioners as part of its power to govern and to pay for the costs of self-government.

## B

Alternatively, if we accept the argument, advanced by petitioners and the dissent, that the Tribe's authority to tax derives solely from its power to exclude non-Indians from the reservation, we conclude that the Tribe has the authority to impose the severance tax challenged here.   Nonmembers who lawfully enter tribal lands remain subject to the tribe's *power* to exclude them.   This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation.   When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its *ultimate* power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry.   However, it does not follow that the lawful property right to be on Indian land also immunizes the non-Indian from the tribe's exercise of its lesser-included power to tax or to

---

[8] Both the classic treatise on Indian law and its subsequent revision by the Department of the Interior, see n. 6, *supra*, agree with this reading of *Buster* v. *Wright*.   Federal Indian Law, *supra* n. 6, at 438; Cohen, *supra* n. 6, at 142 (both citing *Buster* v. *Wright* for the proposition that the power to tax is an inherent sovereign power not dependent on the power to exclude).

place other conditions on the non-Indian's conduct or continued presence on the reservation.[9]  A nonmember who enters the jurisdiction of the tribe remains subject to the risk that the tribe will later exercise its sovereign power.  The fact that the tribe chooses not to exercise its power to tax when it initially grants a non-Indian entry onto the reservation does not permanently divest the tribe of its authority to impose such a tax.[10]

Petitioners argue that their leaseholds entitle them to enter the reservation and exempt them from further exercises of the Tribe's sovereign authority.  Similarly, the dissent asserts that the Tribe has lost the power to tax petitioners' mining activities because it has leased to them the use of the mineral lands and such rights of access to the reservation as might be necessary to enjoy the leases.  *Post*, at 186–190.[11]  However, this conclusion is not compelled by linking the taxing power to the power to exclude.  Instead, it is based on additional assumptions and confusions about the consequences of the commercial arrangement between petitioners and the Tribe.

Most important, petitioners and the dissent confuse the Tribe's role as commercial partner with its role as sover-

---

[9] See also *Barta* v. *Oglala Sioux Tribe of Pine Ridge Reservation*, 259 F. 2d 553 (CA8 1958) (lessees of tribal lands subject to Indian tax on use of land).

[10] Here, the leases extend for as long as minerals are produced in paying quantities, in other words, until the resources are depleted.  Thus, under the dissent's approach, the Tribe would never have the power to tax petitioners regardless of the financial burden to the Tribe of providing and maintaining governmental services for the benefit of petitioners.

[11] But see *Buster* v. *Wright*, 135 F., at 958:

"The ultimate conclusion of the whole matter is that purchasers of lots in town sites in towns or cities within the original limits of the Creek Nation, who are in lawful possession of their lots, are still subject to the laws of that nation prescribing permit taxes for the exercise by noncitizens of the privilege of conducting business in those towns . . . ."

eign.[12]    This confusion relegates the powers of sovereignty to the bargaining process undertaken in each of the sovereign's commercial agreements.    It is one thing to find that the Tribe has agreed to sell the right to use the land and take from it valuable minerals; it is quite another to find that the Tribe has abandoned its sovereign powers simply because it has not expressly reserved them through a contract.

Confusing these two results denigrates Indian sovereignty.    Indeed, the dissent apparently views the tribal power to exclude, as well as the derivative authority to tax, as merely the power possessed by any individual landowner or any social group to attach conditions, including a "tax" or fee, to the entry by a stranger onto private land or into the social group, and not as a sovereign power.    The dissent does pay lipservice to the established views that Indian tribes retain those fundamental attributes of sovereignty, including the power to tax transactions that occur on tribal lands, which have not been divested by Congress or by necessary implication of the tribe's dependent status, see *Colville*, 447 U. S., at 152, and that tribes "are a good deal more than 'private, voluntary organizations.'"    *United States* v. *Mazurie*, 419 U. S., at 557.    However, in arguing that the Tribe somehow "lost" its power to tax petitioners by not in-

---

[12] In contrast, the 1958 treatise on Indian law written by the United States Solicitor for the Department of the Interior recognized and distinguished the scope of these two roles when it embraced as the "present state of the law" the following summary:

"'Over tribal lands, *the tribe has the rights of a landowner as well as the rights of a local government, dominion as well as sovereignty.*  But over all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders, the tribe has the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business, provided only such determination is consistent with applicable Federal laws and does not infringe any vested rights of persons now occupying reservation lands under lawful authority.'"    Federal Indian Law, *supra* n. 6, at 439 (quoting Solicitor's Opinion of Oct. 25, 1934) (emphasis added).

See Cohen, *supra* n. 6, at 143.

cluding a taxing provision in the original leases or otherwise notifying petitioners that the Tribe retained and might later exercise its sovereign right to tax them, the dissent attaches little significance to the sovereign nature of the tribal authority to tax, and it obviously views tribal authority as little more than a landowner's contractual right. This overly restrictive view of tribal sovereignty is further reflected in the dissent's refusal to apply established principles for determining whether other governmental bodies have waived a sovereign power through contract. See *post*, at 189, n. 50. See also *infra*, at 148.

Moreover, the dissent implies that the power to tax depends on the consent of the taxed as well as on the Tribe's power to exclude non-Indians. Whatever place consent may have in contractual matters and in the creation of democratic governments, it has little if any role in measuring the validity of an exercise of legitimate sovereign authority. Requiring the consent of the entrant deposits in the hands of the excludable non-Indian the source of the tribe's power, when the power instead derives from sovereignty itself. Only the Federal Government may limit a tribe's exercise of its sovereign authority. *E. g., United States* v. *Wheeler*, 435 U. S. 313, 322 (1978).[13] Indian sovereignty is not conditioned on the assent of a nonmember; to the contrary, the nonmember's presence and conduct on Indian lands are conditioned by the limitations the tribe may choose to impose.

Viewed in this light, the absence of a reference to the tax in the leases themselves hardly impairs the Tribe's authority to impose the tax. Contractual arrangements remain subject to subsequent legislation by the presiding sovereign. See, *e. g., Veix* v. *Sixth Ward Building & Loan Assn. of*

---

[13] See also P. Maxfield, M. Dieterich, & F. Trelease, Natural Resources Law on American Indian Lands 4–6 (1977). Federal limitations on tribal sovereignty can also occur when the exercise of tribal sovereignty would be inconsistent with overriding national interests. See *Colville*, 447 U. S., at 153. This concern is not presented here. See *ibid.*

*Newark*, 310 U. S. 32 (1940); *Home Building & Loan Assn.*
v. *Blaisdell*, 290 U. S. 398 (1934). Even where the contract
at issue requires payment of a royalty for a license or fran-
chise issued by the governmental entity, the government's
power to tax remains unless it "has been specifically surren-
dered in terms which admit of no other reasonable interpre-
tation." *St. Louis* v. *United R. Co.*, 210 U. S. 266, 280
(1908).

To state that Indian sovereignty is different than that of
Federal, State or local Governments, see *post*, at 189, n. 50,
does not justify ignoring the principles announced by this
Court for determining whether a sovereign has waived its
taxing authority in cases involving city, state, and federal
taxes imposed under similar circumstances. Each of these
governments has different attributes of sovereignty, which
also may derive from different sources. These differences,
however, do not alter the principles for determining whether
any of these governments has waived a sovereign power
through contract, and we perceive no principled reason for
holding that the different attributes of Indian sovereignty re-
quire different treatment in this regard. Without regard to
its source, sovereign power, even when unexercised, is an
enduring presence that governs all contracts subject to the
sovereign's jurisdiction, and will remain intact unless surren-
dered in unmistakable terms.

No claim is asserted in this litigation, nor could one be, that
petitioners' leases contain the clear and unmistakable surren-
der of taxing power required for its extinction. We could
find a waiver of the Tribe's taxing power only if we inferred it
from silence in the leases. To presume that a sovereign for-
ever waives the right to exercise one of its sovereign powers
unless it expressly reserves the right to exercise that power
in a commercial agreement turns the concept of sovereignty
on its head, and we do not adopt this analysis.[14]

---

[14] Petitioners and the dissent also argue that we should infer a waiver of
the taxing power from silence in the Tribe's original Constitution. Al-
though it is true that the Constitution in force when petitioners signed

## C

The Tribe has the inherent power to impose the severance tax on petitioners, whether this power derives from the Tribe's power of self-government or from its power to exclude. Because Congress may limit tribal sovereignty, we now review petitioners' argument that Congress, when it enacted two federal Acts governing Indians and various pieces of federal energy legislation, deprived the Tribe of its authority to impose the severance tax.

In *Colville*, we concluded that the "widely held understanding within the Federal Government has always been that *federal law to date has not worked a divestiture of Indian taxing power.*" 447 U. S., at 152 (emphasis added). Moreover, we noted that "[n]o federal statute cited to us shows any congressional departure from this view." *Id.*, at 153. Likewise, petitioners can cite to no statute that specifically divests the Tribe of its power to impose the severance tax on their mining activities. Instead, petitioners argue that Congress *implicitly* took away this power when it enacted the Acts and various pieces of legislation on which petitioners rely. Before reviewing this argument, we reiterate here our admonition in *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 60 (1978): "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."

---

their leases did not include a provision specifically authorizing a severance tax, neither the Tribe's Constitution nor the Federal Constitution is the font of any sovereign power of the Indian tribes. *E. g., Iron Crow* v. *Oglala Sioux Tribe of Pine Ridge Reservation*, 231 F. 2d 89, 94 (CA8 1956); *Buster* v. *Wright*, 135 F., at 950. Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence on this point is that the sovereign power to tax remains intact. The Tribe's Constitution was amended to authorize the tax before the tax was imposed, and this is the critical event necessary to *effectuate* the tax. See *Barta* v. *Oglala Sioux Tribe of Pine Ridge Reservation*, 259 F. 2d, at 554, 556; *Iron Crow* v. *Oglala Sioux Tribe of Pine Ridge Reservation, supra*, at 99.

Petitioners argue that Congress pre-empted the Tribe's power to impose a severance tax when it enacted the 1938 Act, 25 U. S. C. §§ 396a–396g. In essence, petitioners argue that the tax constitutes an additional burden on lessees that is inconsistent with the Act's regulatory scheme for leasing and developing oil and gas reserves on Indian land. This Act, and the regulations promulgated by the Department of the Interior for its enforcement, establish the procedures to be followed for leasing oil and gas interests on tribal lands. However, the proviso to 25 U. S. C. § 396b states that "the foregoing provisions *shall in no manner restrict the right of tribes* . . . to lease lands for mining purposes . . . *in accordance with the provisions of any constitution and charter adopted by any Indian tribe pursuant to sections 461, 462, 463, [464–475, 476–478], and 479 of this title*" (emphasis added).[15] Therefore, this Act does not prohibit the Tribe from imposing a severance tax on petitioners' mining activities pursuant to its Revised Constitution, when both the Revised Constitution and the ordinance authorizing the tax are approved by the Secretary.[16]

Petitioners also assert that the 1927 Act, 25 U. S. C. §§ 398a–398e, divested the Tribe's taxing power. We disagree. The 1927 Act permits state taxation of mineral les-

---

[15] The Secretary has implemented the substance of this proviso by the following regulation:

"The regulations in this part may be superseded by the provisions of any tribal constitution, bylaw or charter issued pursuant to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984; 25 U. S. C. 461–479), . . . or by ordinance, resolution or other action authorized under such constitution, bylaw or charter. The regulations in this part, in so far as they are not so superseded, shall apply to leases made by organized tribes if the validity of the lease depends upon the approval of the Secretary of the Interior." 25 CFR § 171.29 (1980).

[16] In arguing that the 1938 Act was intended to pre-empt the severance tax, petitioners attach great significance to the Secretary's approval of the leases. Curiously, they attach virtually no significance to the fact that the Secretary also approved the tax ordinance that they challenge here.

sees on Executive Order reservations, but it indicates no change in the taxing power of the affected tribes. See 25 U. S. C. § 398c. Without mentioning the tribal authority to tax, the Act authorizes state taxation of royalties from mineral production on all Indian lands. Petitioners argue that the Act transferred the Indian power to tax mineral production to the States in exchange for the royalties assured the tribes. This claim not only lacks any supporting evidence in the legislative history, it also deviates from settled principles of taxation: different sovereigns can enjoy powers to tax the same transactions. Thus, the mere existence of state authority to tax does not deprive the Indian tribe of its power to tax. *Fort Mojave Tribe* v. *County of San Bernardino*, 543 F. 2d 1253 (CA9 1976), cert. denied, 430 U. S. 983 (1977). Cf. *Colville*, 447 U. S., at 158 ("There is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other").[17]

Finally, petitioners contend that tribal taxation of oil and gas conflicts with national energy policies, and therefore the tribal tax is pre-empted by federal law. Again, petitioners cite no specific federal statute restricting Indian sovereignty. Nor do they explain why state taxation of the same type of activity escapes the asserted conflict with federal policy. Cf. *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981). Indeed, rather than forbidding tribal severance taxes, Congress has included taxes imposed by an Indian

---

[17] The Tribe argues that the 1927 Act granting the States the power to tax mineral production on Indian land is inapplicable because the leases at issue here were signed pursuant to the 1938 Act. The 1938 Act, which makes uniform the laws applicable to leasing mineral rights on tribal lands, does not contain a grant of power to the States comparable to that found in the 1927 Act. As a result, the Tribe asserts that the State of New Mexico has no power to tax the production under petitioners' leases with the Tribe. Because the State of New Mexico is not a party to this suit, the Court of Appeals did not reach this issue. See 617 F. 2d, at 547–548, n. 5. For this reason, and because we conclude that the 1927 Act did not affect the Tribe's authority to tax, we likewise do not reach this issue.

tribe in its definition of costs that may be recovered under federal energy pricing regulations. Natural Gas Policy Act of 1978, Pub. L. 95–621, §§ 110(a), (c)(1), 92 Stat. 3368, 15 U. S. C. §§ 3320(a), (c)(1) (1976 ed., Supp. IV). Although this inclusion may not reflect Congress' view with respect to the source of a tribe's power to impose a severance tax,[18] it surely indicates that imposing such a tax would not contravene federal energy policy and that the tribal authority to do so is not implicitly divested by that Act.

We find no "clear indications" that Congress has implicitly deprived the Tribe of its power to impose the severance tax. In any event, if there were ambiguity on this point, the doubt would benefit the Tribe, for "[a]mbiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143–144 (1980). Accordingly, we find that the Federal Government has not divested the Tribe of its inherent authority to tax mining activities on its land, whether this authority derives from the Tribe's power of self-government or from its power to exclude.

### III

Finding no defect in the Tribe's exercise of its taxing power, we now address petitioners' contention that the severance tax violates the "negative implications" of the Commerce Clause because it taxes an activity that is an integral

---

[18] The statute provides that Indian severance taxes may be recovered through federal energy pricing. However, the legislative history indicates that Congress took no position on the source of the Indian tribes' power to impose the tax in the first place:

"While severance taxes which may be imposed by an Indian tribe are to be treated in the same manner as State imposed severance taxes, the conferees do not intend to prejudge the outcome of the cases on appeal before the Tenth Circuit Court of Appeals respecting the right of Indian tribes to

part of the flow of commerce, discriminates against interstate commerce, and imposes a multiple burden on interstate commerce. At the outset, we note that reviewing tribal action under the Interstate Commerce Clause is not without conceptual difficulties. *E. g.*, nn. 21 and 24, *infra*. Apparently recognizing these difficulties, the Solicitor General, on behalf of the Secretary, argues that the language,[19] the structure, and the purposes of the Commerce Clause support the conclusion that the Commerce Clause does not, of its own force, limit Indian tribes in their dealings with non-Indians. Brief for Secretary of Interior 35–40. The Solicitor General reasons that the Framers did not intend "the courts, through the Commerce Clause, to impose their own views of the proper relationship between Indians and non-Indians and to strike down measures adopted by a tribe with which the political departments of government had not seen fit to disagree." *Id.*, at 39. Instead, where tribal legislation is inimical to the national welfare, the Solicitor asserts that the Framers contemplated that the remedies would be the negotiation or renegotiation of treaties, the enactment of legislation governing trade and other relations, or the exertion of superior force by the United States Government. *Id.*, at 38–39. Using similar reasoning, the Solicitor suggests that if the Commerce Clause does impose restrictions on tribal activity, those restrictions must arise from the Indian Commerce Clause, and not its interstate counterpart. *Id.*, at 40–43.

To date, however, this Court has relied on the Indian Commerce Clause as a shield to protect Indian tribes from state

impose taxes on persons or organizations other than Indians who are engaged in business activities on Indian reservations. The outcome of the cases on appeal will determine the legality of imposing such taxes." S. Conf. Rep. No. 95–1126, p. 91 (1978); H. R. Conf. Rep. No. 95–1752, p. 91 (1978).

[19] The Commerce Clause empowers Congress "[t]o regulate Commerce *with* foreign Nations, and *among* the several States, and *with* the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3 (emphasis added).

and local interference, and has not relied on the Clause to authorize tribal regulation of commerce without any constitutional restraints. We see no need to break new ground in this area today: even if we assume that tribal action is subject to the limitations of the Interstate Commerce Clause, this tax does not violate the "negative implications" of that Clause.

### A

A state tax may violate the "negative implications" of the Interstate Commerce Clause by unduly burdening or discriminating against interstate commerce. See, e. g., *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981); *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977). Judicial review of state taxes under the Interstate Commerce Clause is intended to ensure that States do not disrupt or burden interstate commerce when Congress' power remains unexercised: it protects the free flow of commerce, and thereby safeguards Congress' latent power from encroachment by the several States.

However, we only engage in this review when Congress has not acted or purported to act. See, e. g., *Prudential Insurance Co.* v. *Benjamin*, 328 U. S. 408, 421–427 (1946). Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action. See *Prudential Insurance Co.* v. *Benjamin, supra,* at 431.[20] Courts are

---

[20] In *Prudential Insurance Co.* v. *Benjamin,* this Court refused to invalidate a South Carolina tax on out-of-state insurance companies despite appellant's contention that the tax impermissibly burdened interstate commerce. The Court refused to entertain appellant's argument because Congress, in passing the McCarran-Ferguson Act, had provided that "si-

final arbiters under the Commerce Clause only when Congress has not acted. See *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S., at 454.

Here, Congress has affirmatively acted by providing a series of federal checkpoints that must be cleared before a tribal tax can take effect.[21] Under the Indian Reorganization Act, 25 U. S. C. §§ 476, 477, a tribe must obtain approval from the Secretary before it adopts or revises its constitution to announce its intention to tax nonmembers. Further, before the ordinance imposing the severance tax challenged here could take effect, the Tribe was required again to obtain approval from the Secretary. See Revised Constitution of the Jicarilla Tribe, Art. XI, §§ 1(e), 2. Cf. 25 U. S. C. §§ 476, 477; 25 CFR § 171.29 (1980) (implementing the proviso to 25 U. S. C. § 396b, quoted in n. 15, *supra*).

As we noted earlier, the severance tax challenged by petitioners was enacted in accordance with this congressional scheme. Both the Tribe's Revised Constitution and the challenged tax ordinance received the requisite approval from the Secretary. This course of events fulfilled the administrative process established by Congress to monitor such exercises of tribal authority. As a result, this tribal tax comes to us in a

---

lence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of [the business of insurance] by the several States." 59 Stat. 33, 15 U. S. C. § 1011.

[21] Although Congress has not expressly announced that Indian taxes do not threaten its latent power to regulate interstate commerce, it is unclear how Congress could articulate that intention any more convincingly than it has done here. In contrast to when Congress acts with respect to the States, when Congress acts with respect to the Indian tribes, it generally does so pursuant to its authority under the Indian Commerce Clause, or by virtue of its superior position over the tribes, not pursuant to its authority under the Interstate Commerce Clause. This is but one of the difficulties inherent in reviewing under the Interstate Commerce Clause both tribal action and congressional action regulating the tribes. Therefore, in determining whether Congress has "acted" to preclude judicial review, we do not find it significant that the congressional action here was not taken pursuant to the Interstate Commerce Clause.

posture significantly different from a challenged state tax, which does not need specific federal approval to take effect, and which therefore requires, in the absence of congressional ratification, judicial review to ensure that it does not unduly burden or discriminate against interstate commerce. Judicial review of the Indian tax measure, in contrast, would duplicate the administrative review called for by the congressional scheme.

Finally, Congress is well aware that Indian tribes impose mineral severance taxes such as the one challenged by petitioners. See Natural Gas Policy Act of 1978, 15 U. S. C. §§ 3320(a), (c)(1) (1976 ed., Supp. IV). Congress, of course, retains plenary power to limit tribal taxing authority or to alter the current scheme under which the tribes may impose taxes. However, it is not our function nor our prerogative to strike down a tax that has traveled through the precise channels established by Congress, and has obtained the specific approval of the Secretary.

## B

The tax challenged here would survive judicial scrutiny under the Interstate Commerce Clause, even if such scrutiny were necessary. In *Complete Auto Transit, Inc.* v. *Brady, supra,* at 279, we held that a state tax on activities connected to interstate commerce is sustainable if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." Petitioners do not question that the tax on the severance of minerals from the mines[22] meets the first and the

---

[22] Petitioners initially contend that the ordinance taxes the transportation of the minerals from the reservation, not their severance from the mines. As a result, they argue that the ordinance impermissibly burdens interstate commerce by taxing the movement in commerce itself, which is not a local event. The tax, by its terms, applies to resources that are "produced on the Jicarilla Apache Tribe Reservation and sold or transported off the Reservation." App. 39. The Tribe explains that this language was used

second tests: the mining activities taxed pursuant to the ordinance occur entirely on reservation land. Furthermore, petitioners do not challenge the tax on the ground that the amount of the tax is not fairly related to the services provided by the Tribe. See Supplemental Brief for Petitioners in No. 80–15, pp. 11, 17–20.[23]

Instead, petitioners focus their attack on the third factor, and argue that the tax discriminates against interstate commerce. In essence, petitioners argue that the language "sold or transported off the reservation" exempts from taxation minerals sold on the reservation, kept on the reservation for use by individual members of the Tribe, and minerals taken by the Tribe on the reservation as in-kind royalty. Although petitioners admit that no sales have occurred on the reservation to date, they argue that the Tribe might induce private industry to locate on the reservation to take advantage of this allegedly discriminatory taxing policy. We do not accept petitioners' arguments; instead, we agree with the Tribe, the Solicitor General, and the Court of Appeals that the tax is imposed on minerals sold on the reservation or transported off the reservation before sale. See 617 F. 2d, at 546. Cf. n. 22, *supra*.[24] Under this interpretation, the tax does not

because no sale occurs prior to the transportation off the reservation. The Tribe's tax is due at the time of severance. *Id.*, at 38. Therefore, we agree with the Court of Appeals that the taxable event defined by the ordinance is the removal of minerals from the soil, not their transportation from the reservation. See 617 F. 2d, at 546.

[23] The Court of Appeals noted that, because the lessees chose not to build a factual foundation to challenge the tax on this ground, there was no basis on which to find that the tax was not fairly related to the services provided by the Tribe. See *id.*, at 545, n. 4. Indeed, when the Tribe attempted to introduce at trial evidence of the services it had provided to establish this relationship, the District Court rejected this evidence upon petitioners' objection that such evidence was irrelevant to their challenge. Brief for Respondent Jicarilla Apache Tribe 7–8; 6 Record 278–290, 294, 300–308.

[24] The ordinance does not distinguish between minerals remaining within New Mexico and those transported beyond the state boundary. As a result, petitioners' argument that the tax discriminates against interstate

treat minerals transported away from the reservation differently than it treats minerals that might be sold on the reservation. Nor does the Tribe's tax ordinance exempt minerals ultimately received by individual members of the Tribe. The ordinance does exempt minerals received by the Tribe as in-kind payments on the leases and used for tribal purposes,[25] but this exemption merely avoids the administrative makework that would ensue if the Tribe, as local government, taxed the amount of minerals that the Tribe, as commercial partner, received in royalty payments. Therefore, this exemption cannot be deemed a discriminatory preference for local commerce.[26]

---

commerce by favoring local sales focuses on the boundary between the reservation and the State of New Mexico and not on any interstate boundaries. We will assume for purposes of this argument only that this alleged reservation-state discrimination could give rise to a Commerce Clause violation.

[25] Paragraph 4 of the ordinance specifies that "[r]oyalty gas, oil or condensate taken by the Tribe in kind, and used by the Tribe shall be exempt from taxation." App. 39.

[26] Petitioners contend that because New Mexico may tax the same mining activity at full value, the Indian tax imposes a multiple tax burden on interstate commerce in violation of the Commerce Clause. The multiple taxation issue arises where two or more taxing jurisdictions point to some contact with an enterprise to support a tax on the entire value of its multistate activities, which is more than the contact would justify. *E. g., Standard Oil Co.* v. *Peck,* 342 U. S. 382, 384–385 (1952). This Court has required an apportionment of the tax based on the portion of the activity properly viewed as occurring within each relevant State. See, *e. g., Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 219 (1980); *Washington Revenue Dept.* v. *Association of Washington Stevedoring Cos.,* 435 U. S. 734, 746, and n. 16 (1978).

This rule has no bearing here, however, for there can be no claim that the Tribe seeks to tax any more of petitioners' mining activity than the portion occurring within tribal jurisdiction. Indeed, petitioners do not even argue that the Tribe is seeking to seize more tax revenues than would be fairly related to the services provided by the Tribe. See *supra,* at 157, and n. 23. In the absence of such an assertion, and when the activity taxed by the Tribe occurs entirely on tribal lands, the multiple taxation issue would arise only if a *State* attempted to levy a tax on the same activ-

## IV

In *Worcester* v. *Georgia*, 6 Pet., at 559, Chief Justice Marshall observed that Indian tribes had "always been considered as distinct, independent political communities, retaining their original natural rights." Although the tribes are subject to the authority of the Federal Government, the "weaker power does not surrender its independence—its right to self-government, by associating with a stronger, and taking its protection." *Id.*, at 561. Adhering to this understanding, we conclude that the Tribe did not surrender its authority to tax the mining activities of petitioners, whether this authority is deemed to arise from the Tribe's inherent power of self-government or from its inherent power to exclude nonmembers. Therefore, the Tribe may enforce its severance tax unless and until Congress divests this power, an action that Congress has not taken to date. Finally, the severance tax imposed by the Tribe cannot be invalidated on the ground that it violates the "negative implications" of the Commerce Clause.

*Affirmed.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

The Indian tribes that occupied North America before Europeans settled the continent were unquestionably sovereigns. They ruled themselves and they exercised dominion over the lands that nourished them. Many of those tribes, and some attributes of their sovereignty, survive today. This Court, since its earliest days, has had the task of identi-

---

ity, which is more than the *State's* contact with the activity would justify. In such a circumstance, any challenge asserting that tribal and state taxes create a multiple burden on interstate commerce should be directed at the state tax, which, in the absence of congressional ratification, might be invalidated under the Commerce Clause. These cases, of course, do not involve a challenge to state taxation, and we intimate no opinion on the possibility of such a challenge.

fying those inherent sovereign powers that survived the creation of a new Nation and the introduction of an entirely new system of laws applicable to both Indians and non-Indians.

In performing that task, this Court has guarded carefully the unique status of Indian tribes within this Nation. Over its own members, an Indian tribe's sovereign powers are virtually unlimited; the incorporation of the tribe into the United States has done little to change internal tribal relations. In becoming part of the United States, however, the tribes yielded their status as independent nations; Indians and non-Indians alike answered to the authority of a new Nation, organized under a new Constitution based on democratic principles of representative government. In that new system of government, Indian tribes were afforded no general powers over citizens of the United States. Many tribes, however, were granted a power unknown to any other sovereignty in this Nation: a power to exclude nonmembers entirely from territory reserved for the tribe. Incident to this basic power to exclude, the tribes exercise limited powers of governance over nonmembers, though those nonmembers have no voice in tribal government. Since a tribe may exclude nonmembers entirely from tribal territory, the tribe necessarily may impose conditions on a right of entry granted to a nonmember to do business on the reservation.

The question presented in these cases is whether, after a tribe has granted nonmembers access to its reservation on specified terms and conditions to engage in an economic venture of mutual benefit, the tribe may impose a tax on the nonmembers' share of benefits derived from the venture. The Court today holds that it may do so. In my opinion this holding distorts the very concept of tribal sovereignty. Because I am convinced that the Court's treatment of these important cases gives inadequate attention to the critical difference between a tribe's powers over its own members and its powers over nonmembers, I set forth my views at greater length than is normally appropriate in a dissenting opinion.

I

The 2,100 members of the Jicarilla Apache Tribe live on a reservation in northern New Mexico.[1] The area encompassed by the reservation became a part of the United States in 1848 when the Mexican War ended in the Treaty of Guadalupe Hidalgo. See 9 Stat. 922. Between 1848 and 1871, the United States did not enter into any treaty with the Jicarillas or enact any special legislation relating to them; in 1871 Congress outlawed any future treaties with Indian tribes.[2] In 1887, President Cleveland issued an Executive Order setting aside a tract of public lands in the Territory of New Mexico "as a reservation for the use and occupation of the Jicarilla Apache Indians." Except for a provision protecting bona fide settlers from deprivation of previously acquired rights, the Executive Order contained no special rules applicable to the reservation.[3] The mineral leases at issue in this case

---

[1] See Plaintiff's Exhibit E, p. 4.

[2] "[H]ereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: *Provided, further*, That nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe." 16 Stat. 566, current version at 25 U. S. C. § 71.

[3] The entire Executive Order reads as follows:

"EXECUTIVE MANSION, FEBRUARY 11, 1887.

"It is hereby ordered that all that portion of the public domain in the Territory of New Mexico which, when surveyed, will be embraced in the following townships, viz:

"27, 28, 29, and 30 north, ranges 1 east, and 1, 2, and 3 west; 31 and 32 north, ranges 2 west and 3 west, and the south half of township 31 north, range 1 west, be, and the same is hereby, set apart as a reservation for the use and occupation of the Jicarilla Apache Indians: *Provided*, That this order shall not be so construed as to deprive any bona fide settler of any valid rights he may have acquired under the law of the United States providing for the disposition of the public domain.

"Grover Cleveland."

1 C. Kappler, Indian Affairs, Laws and Treaties 875 (1904).

were granted by the Jicarilla Apache Tribe on these reservation lands.

The record does not indicate whether any leasing activity occurred on the Jicarilla Reservation between 1887 and 1953. During that period, however, the authority of Indian tribes to enter into mineral leases was clarified. In 1891 Congress passed a statute permitting the mineral leasing of Indian lands. Act of Feb. 28, 1891, § 3, 26 Stat. 795, 25 U. S. C. § 397. Because the statute applied only to lands "occupied by Indians who have bought and paid for the same," the statute was interpreted to be inapplicable to reservations created by Executive Order. See *British-American Oil Producing Co.* v. *Board of Equalization*, 299 U. S. 159, 161–162, 164. In 1922, the Secretary of the Interior took the position that Indian reservations created by Executive Order were public lands and that Indians residing on those reservations had no right to share in royalties derived from oil and gas leases. 49 I. D. 139.[4]

---

[4] The Secretary contended that the land on Executive Order reservations was subject to leasing, as "lands of the United States," under the Mineral Lands Leasing Act of February 25, 1920, 41 Stat. 437, 30 U. S. C. § 181 *et seq.* In 1924, Attorney General Stone rendered an opinion stating that the Mineral Lands Leasing Act did not apply to Executive Order reservations. 34 Op. Atty. Gen. 181. In 1925, Stone instituted litigation in the District Court of Utah to cancel certain leases that had been authorized by the Secretary of the Interior pursuant to the Mineral Lands Leasing Act. See H. R. Rep. No. 1791, 69th Cong., 2d Sess., 5 (1927). The case was dismissed by stipulation after the enactment of the 1927 Act noted in the text. See *United States* v. *McMahon*, 273 U. S. 782.

A later decision by this Court suggests that the Secretary's position was correct. In *Sioux Tribe of Indians* v. *United States*, 316 U. S. 317, the Court held that an Indian tribe was not entitled to compensation from the United States when an Executive Order reservation was abolished. The Court said:

"Perhaps the most striking proof of the belief shared by Congress and the Executive that the Indians were not entitled to compensation upon the abolition of an executive order reservation is the very absence of compensatory payments in such situations. It was a common practice, during the

In 1927, Congress enacted a statute expressly providing that unallotted lands on any Indian reservation created by Executive Order could be leased for oil and gas mining purposes with the approval of the Secretary of the Interior.[5] The statute directed that all rentals, royalties, or bonuses for such leases should be paid to the Treasurer of the United States for the benefit of the tribe for which the reservation was created.[6] The statute further provided that state taxes

---

period in which reservations were created by executive order, for the President simply to terminate the existence of a reservation by cancelling or revoking the order establishing it. That is to say, the procedure followed in the case before us was typical. No compensation was made, and neither the Government nor the Indians suggested that it was due.

.      .      .      .      .

"We conclude therefore that there was no express constitutional or statutory authorization for the conveyance of a compensable interest to petitioner by the four executive orders of 1875 and 1876, and that no implied Congressional delegation of the power to do so can be spelled out from the evidence of Congressional and executive understanding. The orders were effective to withdraw from sale the lands affected and to grant the use of the lands to the petitioner. But the interest which the Indians received was subject to termination at the will of either the executive or Congress and without obligation to the United States. The executive orders of 1879 and 1884 were simply an exercise of this power of termination, and the payment of compensation was not required." *Id.*, at 330–331.

See also *Tee-Hit-Ton Indians* v. *United States*, 348 U. S. 272, 279–282.

[5] Act of Mar. 3, 1927, 44 Stat. (part 2) 1347, current version at 25 U. S. C. § 398a. Section 1 of the Act provided:

"[U]nallotted lands within the limits of any reservation or withdrawal created by Executive order for Indian purposes or for the use or occupancy of any Indians or tribe may be leased for oil and gas mining purposes in accordance with the provisions contained in the Act of May 29, 1924 [25 U. S. C. § 398]."

See also 25 U. S. C. § 398. Unallotted land is land that had not been allotted in severalty to individual Indians pursuant to the General Allotment Act of 1887, 24 Stat. 388.

[6] Section 2 of the Act provided:

"[T]he proceeds from rentals, royalties, or bonuses of oil and gas leases upon lands within Executive order Indian reservations or withdrawals shall be deposited in the Treasury of the United States to the credit of the

could be levied upon the output of such oil and gas leases,[7] but made no mention of the possibility that the Indian tribes, in addition to receiving royalties, could impose taxes on the output.[8]

In 1934, Congress enacted the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*, which authorized any Indian tribe residing on a reservation to adopt a constitution and bylaws, subject to the approval of the Secretary of the Interior. The Act provided that, "[i]n addition to all powers vested in any Indian tribe or tribal council by existing law," the constitution should vest certain specific powers, such as the power to employ legal counsel, in the tribe.[9] The Act

---

tribe of Indians for whose benefit the reservation or withdrawal was created or who are using and occupying the land, and shall draw interest at the rate of 4 per centum per annum and be available for appropriation by Congress for expenses in connection with the supervision of the development and operation of the oil and gas industry and for the use and benefit of such Indians: *Provided*, That said Indians, or their tribal council, shall be consulted in regard to the expenditure of such money, but no per capita payment shall be made except by Act of Congress." 44 Stat. (part 2) 1347, current version at 25 U. S. C. § 398b.

[7] Section 3 of the Act provided:

"[T]axes may be levied and collected by the State or local authority upon improvements, output of mines or oil and gas wells or other rights, property, or assets of any lessee upon lands within Executive order Indian reservations in the same manner as such taxes are otherwise levied and collected, and such taxes may be levied against the share obtained for the Indians as bonuses, rentals, and royalties, and the Secretary of the Interior is authorized and directed to cause such taxes to be paid out of the tribal funds in the Treasury: *Provided*, That such taxes shall not become a lien or charge of any kind against the land or other property of such Indians." 44 Stat. (part 2) 1347, current version at 25 U. S. C. § 398c.

[8] In 1938, Congress passed the Act of May 11, 1938, 52 Stat. 347, 25 U. S. C. §§ 396a–396g, which was designed in part to achieve uniformity for all mineral leases of Indian lands. Like the 1927 Act, the statute provided that the tribes were entitled to the royalties from such leases. The statute made no mention of taxes. See n. 45, *infra*.

[9] The statute provided, in part:

"Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate

also authorized the Secretary of the Interior to issue a charter of incorporation to an Indian tribe, and provided that the charter could convey to the tribe the power to purchase, manage, and dispose of its property.[10] The 1934 Act was silent concerning the right of an Indian tribe to levy taxes.[11] The first Jicarilla Apache Constitution was approved by the Secretary of the Interior in 1937.[12]

---

constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. . . .

"In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments." 25 U. S. C. § 476.

[10] The statute provided:

"The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law; but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress." 25 U. S. C. § 477.

[11] See F. Cohen, Handbook of Federal Indian Law 267 (1942) (hereinafter Cohen).

[12] The 1937 Constitution made no reference to any power to assess taxes against nonmembers. See 1937 Constitution and By-Laws of the Jicarilla Apache Tribe, Defendants' Exhibit G.

In 1953, the Tribe executed an oil and gas lease with the Phillips Petroleum Co. App. 22–30. The lease, prepared on a form provided by the Bureau of Indian Affairs of the Department of the Interior, presumably is typical of later leases executed between other companies and the Tribe.[13] The lease provides that in return for certain rents, royalties, and a cash bonus of $71,345.99, all to be paid to the treasurer of the Tribe, the Tribe as lessor granted to the lessee "the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and natural gas deposits in or under" the described tracts of land, together with the right to construct and maintain buildings, plants, tanks, and other necessary structures on the surface. *Id.*, at 22–23. The lease is for a term of 10 years following approval by the Secretary of the Interior "and as much longer thereafter as oil and/or gas is produced in paying quantities from said land." *Ibid.* The lessee is obligated to use reasonable diligence in the development of the property, and to pay an annual rental of $1.25 per acre and a royalty of 12½% "of the value or amount" of all oil and gas "produced and saved" from the leased land. *Id.*, at 24, 26. Oil and gas used by the lessee for development and operation of the lease is royalty-free. *Id.*, at 24. The Tribe reserved the rights to use free of charge sufficient gas for any school or other building owned by the Tribe on the leased premises, and to take its royalty in kind. *Id.*, at 27–28.

The lease contains no reference to the payment of taxes. The lessee does, however, agree to comply with all regulations of the Secretary of the Interior

"now or hereafter in force relative to such leases: *Provided*, That no regulation hereafter approved shall effect

---

[13] This lease is attached to petitioners' complaint in No. 80–11. The lease attached to the complaint in No. 80–15 was also executed in 1953. See App. 62. The record does not disclose the date on which most of the leases with petitioners were executed, but the record does indicate that leases were executed as late as 1967. See Plaintiffs' Exhibit 1. Leases of Jicarilla tribal property cover in the aggregate over 500,000 acres of

a change in rate or royalty or annual rental herein speci-
fied without the written consent of the parties to this
lease." *Id.*, at 27.

The lease was approved by the Commissioner of Indian Af-
fairs on behalf of the Secretary of the Interior. *Id.*, at 32.
Both of the 1953 leases described in the record are still
producing.

In 1968, the Tribe adopted a Revised Constitution giving
its Tribal Council authority, subject to approval by the Secre-
tary of the Interior, "to impose taxes and fees on non-mem-
bers of the tribe doing business on the reservation."[14] Eight
years later, the Tribal Council enacted an Oil and Gas Sever-
ance Tax Ordinance, which was approved by the Secretary of
the Interior. The tribal ordinance provides that a severance
tax "is imposed on any oil and natural gas severed, saved and
removed from Tribal lands . . . ." *Id.*, at 38. The rate of
the tax is $0.05 per million Btu's of gas produced on the res-
ervation and sold or transported off the reservation and $0.29
per barrel of crude or condensate produced on the reserva-
tion and sold or transported off the reservation. *Id.*, at 39.
Royalty gas or oil taken by the Tribe, as well as gas or oil
used by the Tribe, is exempt from the tax. *Ibid.* Thus the
entire burden of the tax apparently will fall on nonmembers
of the Tribe. The tax, if sustained, will produce over $2
million in revenues annually.[15]

---

land, comprising almost 69% of the acreage within the Jicarilla Reserva-
tion. Brief for Respondent Jicarilla Apache Tribe 2.

[14] App. to Brief for Petitioners in No. 80–15, pp. 12a–13a. An earlier
Constitution adopted in 1960 contained a similar provision permitting
"taxes and fees on persons doing business on the reservation." See 1960
Constitution of the Jicarilla Apache Tribe, Art. VI, § 5, Defendant's
Exhibit A.

[15] See District Court's Findings of Fact and Conclusions of Law, Finding
No. 32, App. 130. The Tribe's answers to interrogatories indicate that in
1976 the royalties on the leases received by the Tribe amounted to
$3,995,469.69. See Plaintiff's Exhibit E, p. 7; Tr. 269.

## II

The powers possessed by Indian tribes stem from three sources: federal statutes, treaties, and the tribe's inherent sovereignty. Neither the Tribe nor the Federal Government seeks to justify the Jicarilla Tribe's severance tax on the basis of any federal statute,[16] and the Jicarilla Apaches, who reside on an Executive Order reservation, executed no treaty with the United States from which they derive sovereign powers. Therefore, if the severance tax is valid, it must be as an exercise of the Tribe's inherent sovereignty.

Tribal sovereignty is neither derived from nor protected by the Constitution.[17] Indian tribes have, however, retained many of the powers of self-government that they possessed at the time of their incorporation into the United States. As stated by Justice M'Lean in *Worcester* v. *Georgia*, 6 Pet. 515, 580 (concurring opinion):

> "At no time has the sovereignty of the country been recognised as existing in the Indians, but they have been always admitted to possess many of the attributes of sovereignty. All the rights which belong to self-government have been recognised as vested in them."

---

[16] Congress may delegate "sovereign" powers to the tribes. See *United States* v. *Mazurie*, 419 U. S. 544. As indicated, however, neither the 1927 statute permitting Indians to receive royalties from the lease of tribal lands nor the Indian Reorganization Act of 1934 conveys authority to the Indian tribes to tax. See *supra*, at 163–165.

[17] The only reference to Indian tribes in the Constitution is in Art. I, § 8, cl. 3, which provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." More significant than this reference to Indian tribes is the absence of any mention of the tribes in the Tenth Amendment, which provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Similarly, the Court in *United States* v. *Kagama*, 118 U. S. 375, 381–382, stated:

> "[The Indians] were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided."

Two distinct principles emerge from these early statements of tribal sovereignty: that Indian tribes possess broad powers of self-governance over tribal members, but that tribes do not possess the same attributes of sovereignty that the Federal Government and the several States enjoy.[18] In determining the extent of the sovereign powers that the tribes retained in submitting to the authority of the United States,

---

[18] The Indian tribes often have been described as "domestic dependent nations." The term was first used in *Cherokee Nation* v. *Georgia*, 5 Pet. 1, where Chief Justice Marshall, writing for the Court, explained:

"Though the Indians are acknowledged to have an unquestionable, and, heretofore, unquestioned right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government; yet, it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian." *Id.*, at 17.

The United States retains plenary authority to divest the tribes of any attributes of sovereignty. See *United States* v. *Wheeler*, 435 U. S. 313, 319; *Winton* v. *Amos*, 255 U. S. 373, 391–392; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565; 1 American Indian Policy Review Commission, Final Report 106–107 (1977) (hereinafter AIPRC Final Report). Thus, for example, Congress can waive the tribes' sovereign immunity. See *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506, 512.

this Court has recognized a fundamental distinction between the right of the tribes to govern their own internal affairs and the right to exercise powers affecting nonmembers of the tribe.

The Court has been careful to protect the tribes from interference with tribal control over their own members. The Court has recognized that tribes have the power to prosecute members for violations of tribal criminal law, and that this power is an inherent attribute of tribal sovereignty. *United States* v. *Wheeler*, 435 U. S. 313. The tribes also retain the power to create substantive law governing internal tribal affairs. Tribes may define rules of membership, and thus determine who is entitled to the benefits of tribal citizenship, *Roff* v. *Burney*, 168 U. S. 218; establish rules of inheritance, which supersede applicable state law, *Jones* v. *Meehan*, 175 U. S. 1, 29; and determine rights to custody of a child of divorced parents of the tribe, and thus pre-empt adoption proceedings brought in state court. *Fisher* v. *District Court*, 424 U. S. 382. This substantive tribal law may be enforced in tribal courts. *Williams* v. *Lee*, 358 U. S. 217; *Fisher* v. *District Court, supra.*

In many respects, the Indian tribes' sovereignty over their own members is significantly greater than the States' powers over their own citizens. Tribes may enforce discriminatory rules that would be intolerable in a non-Indian community. The equal protection components of the Fifth and Fourteenth Amendments, which limit federal or state authority, do not similarly limit tribal power. See *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56, and n. 7.[19] The criminal jurisdiction of the tribes over their own members is similarly uncon-

---

[19] The Indian Civil Rights Act of 1968, 82 Stat. 77, 25 U. S. C. §§ 1301–1303, prohibits Indian tribes from denying "to any person within its jurisdiction the equal protection of its laws." § 1302(8). In *Santa Clara Pueblo*, however, the Court held that sovereign immunity protected a tribe from suit under the Act, that the Act did not create a pri-

strained by constitutional limitations applicable to the States and the Federal Government.[20]   Thus the use of the word "sovereign" to characterize tribal powers of self-government is surely appropriate.

In sharp contrast to the tribes' broad powers over their own members, tribal powers over nonmembers have always been narrowly confined.[21]   The Court has emphasized that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana* v. *United States*, 450 U. S. 544, 564.   In *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, the Court held that tribes have no criminal jurisdiction over crimes committed by nonmembers within the reservations.[22]   In *Montana* v. *United States*, *supra*, the Court held that the Crow Tribe could not prohibit hunting and fishing by nonmembers on res-

---

vate cause of action cognizable in federal court, and that a tribal court was the appropriate forum for vindication of rights created by the Act.

[20] In *Talton* v. *Mayes*, 163 U. S. 376, the Court held that the Fifth Amendment right to indictment by grand jury does not apply to prosecutions in tribal courts.   See also *United States* v. *Wheeler, supra,* at 328–329.

[21] Certain treaties that specifically granted the right of self-government to the tribes also specifically excluded jurisdiction over nonmembers. See, *e. g.,* Treaty with the Cherokees, Art. 5, 7 Stat. 481 (1835); Treaty with the Choctaws and Chickasaws, Art. 7, 11 Stat. 612 (1855); Treaty with the Creeks and Seminoles, Art. 15, 11 Stat. 703 (1856).

[22] In support of that holding, the Court stated:

"Upon incorportion into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty.   '[T]heir rights to complete sovereignty, as independent nations, [are] necessarily diminished.' *Johnson* v. *M'Intosh*, 8 Wheat. 543, 574 (1823)."   435 U. S., at 209.

See also *New York ex rel. Ray* v. *Martin*, 326 U. S. 496, 499 (state court has jurisdiction to try a non-Indian for a crime committed against a non-Indian on a reservation).

ervation land no longer owned by the Tribe, and indicated that the principle underlying *Oliphant*—that tribes possess limited power over nonmembers—was applicable in a civil as well as a criminal context. As stated by the Court, "[t]hough *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana* v. *United States, supra,* at 565 (footnote omitted).[23]

The tribes' authority to enact legislation affecting nonmembers is therefore of a different character than their broad power to control internal tribal affairs. This difference is

---

[23] Preceding this statement the Court noted that "the Court [in *Oliphant*] quoted Justice Johnson's words in his concurrence in *Fletcher* v. *Peck*, 6 Cranch 87, 147—the first Indian case to reach this Court—that the Indian tribes have lost any 'right of governing every person within their limits except themselves.' 435 U. S., at 209." *Montana* v. *United States*, 450 U. S., at 565. See also *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661 (tribes cannot freely alienate to non-Indians the land they occupy); *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17–18 (tribes cannot enter into direct commercial or foreign relations with other nations).

In *United States* v. *Wheeler, supra*, the Court held that the tribes' power to prosecute its members for tribal offenses was not "implicitly lost by virtue of their dependent status," but stated:

"The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. . . .

"These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status. '[T]he settled doctrine of the law of nations is, that a weaker power does not surrender its independence—its right to self government, by associating with a stronger, and taking its protection.' *Worcester* v. *Georgia* [6 Pet.], at 560–561." 435 U. S., at 326.

consistent with the fundamental principle that "[i]n this Nation each sovereign governs only with the consent of the governed." *Nevada* v. *Hall*, 440 U. S. 410, 426. Since nonmembers are excluded from participation in tribal government, the powers that may be exercised over them are appropriately limited. Certainly, tribal authority over nonmembers—including the power to tax—is not unprecedented. An examination of cases that have upheld this power, however, demonstrates that the power to impose such a tax derives solely from the tribes' power to exclude nonmembers entirely from territory that has been reserved for the tribe. This "power to exclude" logically has been held to include the lesser power to attach conditions on a right of entry granted by the tribe to a nonmember to engage in particular activities within the reservation.

### III

A study of the source of the tribes' power to tax nonmembers must focus on the extent of the tribal power to tax that existed in 1934, when the Indian Reorganization Act was enacted to prevent further erosion of Indian sovereign powers.[24]

---

[24] The Indian Reorganization Act of 1934 confirmed but did not enlarge the inherent sovereign powers of the Indian tribes. Congress intended the Act to "stabilize the tribal organization of Indian tribes by vesting such tribal organizations with real, though limited, authority. . . ." S. Rep. No. 1080, 73d Cong., 2d Sess., 1 (1934). As one commentator interpreted § 16 of the Act:

"[I]t would appear that powers originally held by tribes that were recognized and allowed to be retained by treaties or prior statutes, as well as any additional powers conferred in the same manner, would be retained by tribes that accepted the terms of the 1934 Act. . . . The provision is consistent with the act's purpose of enhancing tribal government in that it recognized and reconfirmed those powers a tribe may already have had as a government." Mettler, A Unified Theory of Indian Tribal Sovereignty, 30 Hastings L. Rev. 89, 97 (1978).

Moreover, although the power given by the Reorganization Act to the Secretary of the Interior to approve or disapprove of the exercise of tribal

Shortly after the Act was passed, the Solicitor of the Department of the Interior issued a formal opinion setting forth his understanding of the powers that might be secured by an Indian tribe and incorporated in its constitution by virtue of the reference in the Reorganization Act to powers vested in an Indian tribe "by existing law." [25] Solicitor Margold con-

---

powers places a limit on tribal sovereignty, that power does not enable the Secretary to add to the inherent powers that a tribe possessed before the Act was passed.

On the other hand, the fact that an Indian tribe may never have had the occasion to exercise a particular power over nonmembers in its early history is not a sufficient reason to deny the existence of that power. Accordingly, the fact that there is no evidence that the Jicarilla Apache Tribe ever imposed a tax of any kind on a nonmember does not require the conclusion that it has no such taxing power. To the extent that the power to tax was an attribute of sovereignty possessed by Indian tribes when the Reorganization Act was passed, Congress intended the statute to preserve those powers for all Indian tribes that adopted a formal organization under the Act.

[25] 55 I. D. 14 (1934). Solicitor Margold described the scope of this opinion as follows:

"My opinion has been requested on the question of what powers may be secured to an Indian tribe and incorporated in its constitution and by-laws by virtue of the following phrase, contained in section 16 of the Wheeler-Howard Act (48 Stat. 984, 987) [the Reorganization Act of 1934]:

'In addition to *all powers vested in any Indian tribe or tribal council by existing law*, the constitution adopted by said tribe shall also vest . . . . [Italics added.]'

"The question of what powers are vested in an Indian tribe or tribal council by existing law cannot be answered in detail for each Indian tribe without reference to hundreds of special treaties and special acts of Congress. It is possible, however, on the basis of the reported cases, the written opinions of the various executive departments, and those statutes of Congress which are of general import, to define the powers which have heretofore been recognized as lawfully within the jurisdiction of an Indian tribe. My answer to the propounded question, then, will be general, and subject to correction for particular tribes in the light of the treaties and statutes affecting such tribe wherever such treaties or statutes contain peculiar provisions restricting or enlarging the general authority of an Indian tribe." *Id.*, at 17–18.

cluded that among those powers was a power of taxation; his opinion described the permissible exercise of that power:

> "Except where Congress has provided otherwise, this power may be exercised over members of the tribe and over nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions." 55 I. D. 14, 46 (1934).

Solicitor Margold cited three decisions in support of this opinion. These three cases, *Buster* v. *Wright*, 135 F. 947 (CA8 1905), appeal dism'd, 203 U. S. 599; *Morris* v. *Hitchcock*, 194 U. S. 384; and *Maxey* v. *Wright*, 3 Ind. T. 243, 54 S. W. 807 (Ct. App. Ind. T.), aff'd, 105 F. 1003 (CA8 1900), were decided shortly after the turn of the century and are the three leading cases considering the power of an Indian tribe to assess taxes against nonmembers.[26] The three cases are similar in result and in their reasoning. In each the court upheld the tax; in each the court relied on the Tribe's power to exclude non-Indians from its reservation and concluded that the Tribe could condition entry or continued presence within the reservation on the payment of a license fee or tax; and in each the court assumed that the ultimate remedy for nonpayment of the tax would be exclusion from the reservation.

In the first of these cases, *Maxey* v. *Wright*, the Court of Appeals of Indian Territory affirmed an order by a federal territorial court dismissing a complaint filed by non-Indian lawyers practicing in the Creek Nation. The complaint sought to enjoin the Indian agent for the Five Civilized Tribes from collecting an annual occupation tax of $25 assessed on each non-Indian lawyer residing and practicing

---

[26] Felix Cohen, in his Handbook on Federal Indian Law published in 1942, also relies on these cases in his discussion of tribal taxation of nonmembers. Cohen 266–267. The Court in *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, cited both *Buster* v. *Wright* and *Morris* v. *Hitchcock* in upholding an exercise of the tribal power to tax. 447 U. S., at 153. See *infra*, at 185.

his profession on the reservation.   In rejecting the attorneys' claim, the Court of Appeals first analyzed the relevant treaties between the United States and the Creeks and noted that the Indians had "carefully guarded their sovereignty, and their right to admit, and consequently to exclude, all white persons, except such as are named in the treaty."   3 Ind. T., at 247, 54 S. W., at 809.   The court noted that the United States had agreed that all persons who were not expressly excepted and were present in the Creek Nation "without the consent of that Nation [were] deemed to be intruders," and that the Government had "pledge[d] itself to remove them."   *Id.*, at 248, 54 S. W., at 809.   Because attorneys were not within any excepted class,[27] the court concluded that the Tribe had the authority to require them either to pay the license fee or to be removed as "intruders."[28] The court held:

---

[27] "Attorneys practicing in the United States courts are not persons who come within the exceptions, for they are not 'in the employment of the government of the United States,' or 'persons peaceably traveling or temporarily sojourning in the country, or trading therein under license from the proper authority of the United States.'"   3 Ind. T., at 248–249, 54 S. W., at 809.

[28] In reaching this conclusion the court relied heavily on two opinions of the Attorney General of the United States.   In the first opinion, issued in 1881, Attorney General MacVeagh supported the validity of Indian permit laws that determined which persons would be permitted to reside on the Choctaw and Chickasaw Reservations.   17 Op. Atty. Gen. 134.   In his discussion of the right of non-Indians to enter and remain on tribal lands, MacVeagh stated:

"Replying to your fourth question: it seems from what has been already said that, besides those persons or classes mentioned by you, only those who have been permitted by the Choctaws or Chickasaws to reside within their limits, or to be employed by their citizens as teachers, mechanics, or skilled agriculturists, have a right to enter and remain on the lands of these tribes; *and the right to remain is gone when the permit has expired.*"   *Id.*, at 136 (emphasis added).

In a second opinion on the same subject, Attorney General Phillips stated in 1884 that, in the absence of a treaty or statute, the power of an Indian tribe "to regulate its own rights of *occupancy,* and to say who shall participate therein and upon what conditions, can not be doubted."   18 Op.

"[T]he Creek nation had the power to impose this condition or occupation tax, if it may be so called, upon attorneys at law (white men) residing and practicing their profession in the Indian Territory. And inasmuch as the government of the United States, in the treaty, had declared that all persons not authorized by its terms to reside in the Creek Nation should be deemed to be intruders, and had obligated itself to remove all such persons from the Creek Nation, the remedy to enforce this provision of the treaty was a removal by the United States from the Creek Nation of the delinquent as an intruder." *Id.*, at 250, 54 S. W., at 809–810.[29]

Atty. Gen. 34, 36. Although the treaties applicable to the Choctaw and Chickasaw Tribes specifically excepted from the grant of self-government the power over nonmembers, the Attorney General did not construe this provision to limit the Tribes' power to exclude:

"I submit that whatever this may mean it does not limit the right of these *tribes* to pass upon the question, who (of persons *indifferent to the United States, i. e.*, neither employés, nor objectionable) shall share their *occupancy* and upon what terms. That is a question which all private persons are allowed to decide for themselves . . . ." *Id.*, at 37.

[29] In other parts of its opinion, the court restated the propositions that the Tribe was "clothed with the power to admit white men, or not, at its option, which, as we hold, gave it the right to impose conditions," 3 Ind. T., at 253, 54 S. W., at 811, and that a lawyer who refused to pay for the privilege of remaining would become an "intruder":

"On the whole case we therefore hold that a lawyer who is a white man, and not a citizen of the Creek Nation, is, pursuant to their statute, required to pay for the privilege of remaining and practicing his profession in that nation the sum of $25; that, if he refuse the payment thereof, he becomes, by virtue of the treaty, an intruder, and that in such a case the government of the United States may remove him from the nation; and that this duty devolves upon the interior department. Whether the interior department or its Indian agents can be controlled by the courts by the writs of mandamus and injunction is not material in this case, because, as we hold, an attorney who refuses to pay the amount required by the statute by its very terms becomes an intruder, whom the United States promises by the terms of the treaty to remove, and therefore in such cases the officers and agents of the interior department would be acting clearly and properly within the scope of their powers." *Id.*, at 256–257, 54 S. W., at 812.

*Morris* v. *Hitchcock*, 194 U. S. 384, decided by this Court in 1904, also arose from a challenge to an enactment of one of the Five Civilized Tribes that required non-Indians to pay annual permit fees. The complainants owned cattle and horses that were grazing on land in the Chickasaw Nation pursuant to contracts with individual members of the Tribe. Complainants filed suit in the District of Columbia seeking an injunction preventing federal officials from removing their cattle and horses from the Indian Territory for failure to pay the permit fees assessed by the Tribe. An order dismissing the complaint was affirmed by the Court of Appeals for the District of Columbia and by this Court.

This Court's opinion first noted that treaties between the United States and the Chickasaw Nation had granted the Tribe the right "to control the presence within the territory assigned to it of persons who might otherwise be regarded as intruders,"[30] and that the United States had assumed the obligation of protecting the Indians from aggression by persons not subject to their jurisdiction. *Id.*, at 389. The Court then reviewed similar legislation that had been adopted by the Chickasaw Nation in 1876,[31] and noted that in 1879 the Senate Committee on the Judiciary had specifically referred to the 1876 legislation and expressed an opinion that it was valid. *Id.*, at 389–390.

The Court also reviewed two opinions of the Attorney General that had concluded that the power of the Chickasaw to impose permit fees had not been withdrawn by Congress.[32]

---

[30] The Court stated:

"And it is not disputed that under the authority of these treaties, the Chickasaw Nation has exercised the power to attach conditions to the presence within its borders of persons who might otherwise not be entitled to remain within the tribal territory." 194 U. S., at 389.

[31] The 1876 legislation required licensed merchants and traders to obtain a permit and pay a fee of $25.

[32] The Court relied on 23 Op. Atty. Gen. 214 (1900) and 23 Op. Atty. Gen. 528 (1901). In the first opinion, Attorney General John W. Griggs stated:

"The treaties and laws of the United States make all persons, with a

Although Congress subsequently had created an express exception in favor of owners of town lots and thus protected them from eviction as intruders, the Court noted that no comparable protection had been given to owners of cattle and horses. *Id.*, at 392–393. On the basis of these authorities, the Court concluded that the Chickasaw legislation imposing grazing fees was valid.

In the third case, *Buster* v. *Wright*, 135 F. 947 (CA8 1905), nonmembers of the Creek Nation brought suit against federal inspectors to enjoin them from stopping the plaintiffs from doing business within the reservation; the nonmembers feared such action because they had refused to pay a permit tax assessed on traders by the Tribe. The Court of Appeals relied on *Morris* v. *Hitchcock* and *Maxey* v. *Wright* in upholding the tax. The opinion for the court by Judge Walter H. Sanborn emphasized that the tax was in the nature of a condition precedent to transacting business within the reservation and that the plaintiffs had ample notice of the tax:

---

few specified exceptions, who are not citizens of an Indian nation or members of an Indian tribe, and are found within an Indian nation without permission, intruders there, and require their removal by the United States. This closes the whole matter, absolutely excludes all but the excepted classes, and fully authorizes these nations to absolutely exclude outsiders, or to permit their residence or business upon such terms as they may choose to impose, and it must be borne in mind that citizens of the United States, have, as such, no more right or business to be there than they have in any foreign nation, and can lawfully be there at all only by Indian permission; and that their right to be or remain or carry on business there depends solely upon whether they have such permission.

"As to the power or duty of your Department in the premises there can hardly be a doubt. Under the treaties of the United States with these Indian nations this Government is under the most solemn obligation, and for which it has received ample consideration, to remove and keep removed from the territory of these tribes, all this class of intruders who are there without Indian permission. The performance of this obligation, as in other matters concerning the Indians and their affairs, has long been devolved upon the Department of the Interior." 23 Op. Atty. Gen., at 218.

> "The permit tax of the Creek Nation, which is the subject of this controversy, is the annual price fixed by the act of its national council, which was approved by the President of the United States in the year 1900, for the privilege which it offers to those who are not citizens of its nation of trading within its borders. The payment of this tax is a mere condition of the exercise of this privilege. No noncitizen is required to exercise the privilege or to pay the tax. He may refrain from the one and he remains free from liability for the other. Thus, without entering upon an extended discussion or consideration of the question whether this charge is technically a license or a tax, the fact appears that it partakes far more of the nature of a license than of an ordinary tax, because it has the optional feature of the former and lacks the compulsory attribute of the latter.

> "Repeated decisions of the courts, numerous opinions of the Attorneys General, and the practice of years place beyond debate the propositions that prior to March 1, 1901, the Creek Nation had lawful authority to require the payment of this tax as a condition precedent to the exercise of the privilege of trading within its borders, and that the executive department of the government of the United States had plenary power to enforce its payment through the Secretary of the Interior and his subordinates, the Indian inspector, Indian agent, and Indian police." 135 F., at 949–950.

The court noted that the traders, who had purchased town lots of the Creek Nation pursuant to a 1901 agreement between the Creeks and the United States, could not rely on that agreement as an implied divestiture of a pre-existing power to tax.[33] The court held that even though noncitizens

---

[33] After citing the opinion of Attorney General Griggs quoted at length in *Morris* v. *Hitchcock*, Judge Sanborn wrote:

"Pursuant to this decision the civilized tribes were charging, and the Indian agent was collecting, taxes from noncitizens engaged in business in

of the Tribe had acquired lawful ownership of lots pursuant to the 1901 agreement and could not be evicted from those lots, they had no right to conduct business within the reservation without paying the permit taxes.[34]

Prior to the enactment of the Indian Reorganization Act in 1934, these three cases were the only judicial decisions considering the power of an Indian tribe to impose a tax on nonmembers.[35]  These cases demonstrate that the power of an

---

these nations.  It was under this state of facts that the United States and the Creek Nation made the agreement of 1901.  Did they intend by that agreement that the Creek Nation should thereby renounce its conceded power to exact these permit taxes?  Both parties knew that this power existed, and the United States, by the act of its President approving the law of the Creek national council, and the Secretary of the Interior by enforcing it, had approved its exercise.  The subject of these taxes was presented to the minds of the contracting parties and was considered during the negotiation of the agreement, for that contract contains express stipulations that cattle grazed on rented allotments shall not be liable to any tribal tax (chapter 676, 31 Stat. 871, § 37), and that 'no noncitizen renting lands from a citizen for agricultural purposes as provided by law, whether such lands have been selected as an allotment or not, shall be required to pay any permit tax' (chapter 676, 31 Stat. 871, § 39).  But they made no provision that noncitizens who engaged in the mercantile business in the Creek Nation should be exempt from these taxes.  As the law then in force required such noncitizens to pay such taxes, as both parties were then aware of that fact and considered the question, and as they made no stipulation to abolish these taxes, the conclusive presumption is that they intended to make no such contract, and that the power of the Creek Nation to exact these taxes, and the authority of the Secretary of the Interior and of his subordinates to collect them, were neither renounced, revoked, nor restricted, but that they remained in full force and effect after as before the agreement of 1901."  135 F., at 954.

[34] *Ibid.*  The court stated:

"The legal effect . . . of the law prescribing the permit taxes is to prohibit noncitizens from conducting business within the Creek Nation without the payment of these taxes."  *Id.*, at 955.

[35] Two decades after the Reorganization Act was passed the problem was revisited by the Eighth Circuit.  In *Iron Crow* v. *Oglala Sioux Tribe of Pine Ridge Reservation*, 231 F. 2d 89 (1956), the court held that the Tribe had the power to assess a tax on a nonmember lessee of land within the reservation for the privilege of grazing stock on reservation land.  And

Indian tribe to impose a tax solely on nonmembers doing business on the reservation derives from the tribe's power to exclude those persons entirely from tribal lands or, in the alternative, to impose lesser restrictions and conditions on a right of entry granted to conduct business on the reservation.[36] This interpretation is supported by the fact that the

---

in *Barta* v. *Oglala Sioux Tribe of Pine Ridge Reservation*, 259 F. 2d 553 (1958), the court held that the United States could bring an action on behalf of the Tribe to collect a license tax of 3 cents per acre per annum for grazing land and 15 cents per acre per annum for farm land levied on nonmember lessees. The court in *Barta* held that the tax did not violate the constitutional rights of the nonmember lessees, stating in part:

"The tribe by provisions of its treaty with the United States has power to provide for the admission of nonmembers of the tribe onto the reservation. Having such power, it has the authority to impose restrictions on the presence of nonmembers within the reservation." *Id.*, at 556.

Language in both *Iron Crow* and *Barta* suggests that the Court of Appeals, unlike the earlier courts, may not have rested the taxing power solely on the power to exclude. The Court of Appeals of course did not have the benefit of our decisions in *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, *Wheeler*, and *Montana* v. *United States*.

[36] In the chapter of his treatise entitled "Taxation," Felix Cohen states: "Though the scope of the power [to tax] as applied to nonmembers is not clear, it extends at least to property of nonmembers used in connection with Indian property as well as to privileges enjoyed by nonmembers in trading with the Indians. The power to tax nonmembers is derived in the cases from the authority, founded on original sovereignty and guaranteed in some instances by treaties, to remove property of nonmembers from the territorial limits of the tribe. Since the tribal government has the power to exclude, it can extract a fee from nonmembers as a condition precedent to granting permission to remain or to operate within the tribal domain." Cohen 266–267 (footnotes omitted).

In another chapter, entitled "The Scope of Tribal Self-Government," cited by the Secretary of the Interior and the Tribe here, Cohen describes the power of taxation as "an inherent attribute of tribal sovereignty which continues unless withdrawn or limited by treaty or by act of Congress . . . ." *Id.*, at 142. After discussing *Buster* v. *Wright*, Cohen cites that case for the proposition that "[t]he power to tax does not depend upon the power to remove and has been upheld where there was no power in the

remedy for the nonpayment of the tax in all three cases was exclusion from the reservation.[37]

As I have noted, a limitation on the power of Indian tribes to tax nonmembers is not simply an archaic concept derived from three old cases that has no basis in logic or equity. Tribal powers over nonmembers are appropriately limited because nonmembers are foreclosed from participation in tribal government. If the power to tax is limited to situations in which the tribe has the power to exclude, then the nonmember is subjected to the tribe's jurisdiction only if he accepts the conditions of entry imposed by the tribe.[38] The limited source of the power to tax nonmembers—the power to exclude intruders—is thus consistent with this Court's rec-

---

tribe to remove the taxpayer from the tribal jurisdiction." Cohen 143. As demonstrated above, however, the license tax in *Buster* was predicated on the tribe's right to attach conditions on the right of nonmembers to conduct business on the reservation; the tribe could prevent such nonmembers from doing business regardless of whether it could physically remove them from the reservation. Moreover, in that same chapter on tribal self-government, Cohen recognizes that tribal taxes have been upheld on the basis of the tribe's power to remove nonmembers from the reservation, and that "[i]t is therefore pertinent, in analyzing the scope of tribal taxing powers, to inquire how far an Indian tribe is empowered to remove nonmembers from its reservation." Cohen 143.

The American Indian Policy Review Commission recognized that the court decisions upholding the tribes' taxing powers "rely largely upon the power of tribes to remove persons from the reservation, and consequently, to prescribe the conditions upon which they shall enter," but argued for a broader source of the right to tax. AIPRC Final Report 178–179.

[37] In *Buster* v. *Wright*, the penalty for nonpayment of the tax was the closing of the nonmember's business, enforced by the Secretary of the Interior. 135 F., at 954. In *Morris* v. *Hitchcock*, the remedy was the removal of the nonmember's cattle from the reservation, again enforced by the United States. 194 U. S., at 392. In *Maxey* v. *Wright*, an attorney refusing to pay the license fee to the Interior Department was subject to removal from the reservation. 3 Ind. T., at 250, 54 S. W., at 810.

[38] "No noncitizen is required to exercise a privilege or to pay the tax. He may refrain from the one and he remains free from liability for the other." *Buster* v. *Wright*, 135 F., at 949.

ognition of the limited character of the power of Indian tribes over nonmembers in general.[39] The proper source of the taxing authority asserted by the Jicarilla Apache Tribe in these cases, therefore, is not the Tribe's inherent power of self-government, but rather its power over the territory that has been set apart for its use and occupation.[40]

This conclusion is consistent with our recent decision in *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134. In that case we held that a tribal tax on cigarettes sold on the reservations of the Colville, Makah, and Lummi Tribes to nonmembers of the Tribes was a permis-

---

[39] See *supra*, at 171–172. As I have indicated, see n. 21, *supra*, treaties recognizing the inherent power of tribal self-government have also deprived the tribes of jurisdiction over nonmembers. Nevertheless, those same treaties often specifically recognized the right of the tribe to exclude nonmembers from the reservation or to attach conditions on their entry. See *e. g.*, Treaty with the Choctaw and Chickasaw, Art. 7, 11 Stat. 612 (1855); Treaty with the Creeks and Seminoles, Art. 15, 11 Stat. 699 (1856). See 2 C. Kappler, Indian Affairs, Laws and Treaties 7, 9, 12, 15, 17, 20, 21, 27, 30, 42, 75, 418, 682, 699, 703, 719, 761, 774, 779, 790, 794, 800, 866, 886, 888, 929, 985, 990, 998, 1008, 1016, 1021 (1904).

[40] The various tribes may have taken a similar view of their power to tax at the time of the Indian Reorganization Act. Cohen's treatise notes:

"The power of an Indian tribe to levy taxes upon its own members and upon nonmembers doing business within the reservations has been affirmed in many tribal constitutions approved under the Wheeler-Howard Act [Indian Reorganization Act], as has the power to remove nonmembers from land over which the tribe exercises jurisdiction." Cohen 143.

The following clause from the 1935 Constitution of the Rosebud Sioux Tribe, which Cohen cites as a "typical" statement of such "tribal powers," indicates that the Tribe perceived the scope of its taxation powers over nonmembers to be narrower than the scope of that power over members. The Constitution conveys tribal power—

"(h) To levy taxes upon members of the tribe and to require the performance of reservation labor in lieu thereof, and to levy taxes or license fees, subject to review by the Secretary of the Interior, upon nonmembers doing business within the reservation.

"(i) To exclude from the restricted lands on the reservation persons not legally entitled to reside therein, under ordinances which shall be subject to review by the Secretary of the Interior." *Ibid.*

sible exercise of the Tribes' retained sovereign power to tax.[41] We recognized that the power to tax non-Indians entering the reservation had not been divested by virtue of the Tribes' dependent status and that no overriding federal interest would be frustrated by the tribal taxation. The Court quoted with approval, as an indication of the Executive Branch's understanding of the taxing power, Solicitor Margold's 1934 opinion. The Court noted further that "[f]ederal courts also have acknowledged tribal power to tax non-Indians entering the reservation to engage in economic activity" and cited *Buster* v. *Wright* and *Morris* v. *Hitchcock*. 447 U. S., at 153.[42] The tax in *Colville*, which was applied to nonmembers who entered the reservation and sought to purchase cigarettes, is clearly valid under the rationale that the tribes' power to tax derives from the right to exclude nonmembers from the reservation and the lesser right to attach conditions on the entry of such nonmembers seeking to do business there.[43] *Colville* is consistent with the principles set forth above. The power of Indian tribes to tax nonmembers stems from the tribes' power to exclude those nonmembers; any exercise of this power must be consistent with its source.[44]

---

[41] The Court stated:

"The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status." 447 U. S., at 152.

[42] The Court also cited, without discussion, the Eighth Circuit's decision in *Iron Crow* v. *Oglala Sioux Tribe*, 231 F. 2d 89 (1956). See n. 35, *supra*.

[43] A nonmember can avoid the tax by declining to do business on the reservation; the "sanction" imposed for refusal to pay the tax is denial of permission to buy cigarettes.

[44] In some respects the tribal power to tax nonmembers may be greater than the taxing power of other sovereigns. States do not have any power to exclude nonresidents from their borders. Moreover, their taxing statutes, like their other laws, must comply with the Equal Protection Clause of the Fourteenth Amendment. They may not, therefore, impose discriminatory taxes as a condition attached to entry into the jurisdiction in

## IV

The power to exclude petitioners would have supported the imposition of a discriminatory tribal tax on petitioners when they sought to enter the Jicarilla Apache Reservation to explore for minerals. Moreover, even if no tax had been imposed at the time of initial entry, a discriminatory severance tax could have been imposed as a condition attached to the grant of the privilege of extracting minerals from the earth.[45] But the Tribe did not impose any tax prior to petitioners' entry or as a condition attached to the privileges granted by the leases in 1953. As a result, the tax imposed in 1976 is not valid unless the Tribe retained its power either to exclude petitioners from the reservation or to prohibit them from continuing to extract oil and gas from reservation lands.

The leases executed by the Tribe and petitioners are clearly valid and binding on both parties. The Tribe does not contend that the leases were not the product of arm's-length bargaining. Moreover, the leases were executed on a form prepared by the Department of the Interior, the Department gave specific approval to the terms of the leases, and they were executed pursuant to explicit congressional authority.[46] Under the leases petitioners clearly have the

---

order to engage in economic activity. But since an Indian tribe has exclusive control over the "use and occupancy" of land within its reservation, it arguably could attach special discriminatory conditions to any license to a nonmember to use or occupy a portion of that land. As stated earlier, at a minimum the equal protection components of the Fifth and Fourteenth Amendments, which limit the sovereign powers of the Federal and State Governments, do not similarly restrict the sovereign powers of an Indian tribe. See *supra*, at 170.

[45] "[A]s the payment of a tax or license fee may be made a condition of entry upon tribal land, it may also be made a condition to the grant of other privileges, such as the acquisition of a tribal lease." Cohen 143.

[46] Congress intended the Act of March 3, 1927, to make applicable to Executive Order reservations the leasing provisions already applicable to treaty reservations pursuant to the Act of May 29, 1924, ch. 210, 43 Stat. 244. S. Rep. No. 1240, 69th Cong., 2d Sess., 3 (1927). The 1927 Act thus permitted the leasing of unallotted Indian land for terms not to exceed 10

right to remain on the reservation to do business for the duration of the contracts.[47]

There is no basis for a claim that exercise of the mining rights granted by the leases was subject to an additional, unstated condition concerning the payment of severance taxes.[48]

---

years and as much longer as oil and gas in paying quantities were found on the land. 44 Stat. (part 2) 1347. Among the purposes of the 1927 statute were to "[p]ermit the exploration for oil and gas on Executive-order Indian Reservations," to "[g]ive the Indian tribes all the oil and gas royalties," and to "[p]lace with Congress the future determination of any changes of boundaries of Executive-order reservations or withdrawals." S. Rep. No. 1240, *supra*, at 3. In light of these purposes, it is clear that Congress intended leases executed pursuant to the 1927 Act to be binding.

The Tribe contends that the leases in these cases were executed pursuant to the Act of May 11, 1938, 52 Stat. 347, and not the 1927 Act. The Tribe notes that the lease in No. 80–15 states that it was executed pursuant to the 1938 Act. See App. 64. In response, petitioners note that, although the Tribe argues that the 1938 Act—unlike the 1927 Act—does not require that royalties be paid to the Secretary of the Interior for the benefit of the Tribe, petitioners make their royalty payments to the United States Geological Survey for the benefit of the Jicarilla Apache. See Tr. 79–80. There is no need to resolve this question, because for our purposes the provisions of the 1938 Act do not vary significantly from the provisions of the 1927 Act. The 1938 Act, like the 1927 Act, permits the leasing of Indian lands for a period "not to exceed ten years and as long thereafter as minerals are produced in paying quantities." 25 U. S. C. § 396a. One of the purposes of the 1938 Act was to establish uniformity in the leasing of tribal lands by applying the law governing oil and gas leasing to all other mineral leasing as well. S. Rep. No. 985, 75th Cong., 1st Sess., 1–2 (1937). Other purposes were to "bring all mineral leasing matters in harmony with the Indian Reorganization Act," *id.*, at 3, and to enact changes designed "to give the Indians the greatest return from their property." *Id.*, at 2. There is no indication in the legislative history that the purposes of the 1938 Act are in any way inconsistent with the purposes of the 1927 Act and prior legislation. Presumably the purposes of the earlier legislation were incorporated into the uniform scheme intended by the 1938 Act.

[47] As Attorney General MacVeagh stated in 1881, only those permitted by the tribe to remain on the reservation may do so, "and the right to remain is gone when the permit has expired." 17 Op. Atty. Gen., at 136.

[48] In *Colville*, the nonmember desiring to purchase cigarettes on the reservation knew that his right to do so was conditioned on his consent to pay the tax. Attorney General Griggs, in his 1900 opinion on "Trespassers on

At the time the leases contained in the record were executed, the Jicarilla Apache Constitution contained no taxing authorization whatever; the severance tax ordinance was not enacted until many years after all lessees had been granted an unlimited right to extract oil and gas from the reservation. In addition, the written leases unambiguously stated:

> "[N]o regulation hereafter approved shall effect a change in rate or royalty or annual rental herein specified without the written consent of the parties to this lease." App. 27.

Nor can it be said that notice of an inherent right to tax could have been gleaned from relevant statutory enactments. When Congress enacted legislation in 1927 granting the Indians the royalty income from oil and gas leases on reservations created by Executive Order, it neither authorized nor prohibited the imposition of any taxes by the tribes. Although the absence of such reference does not indicate that Congress pre-empted the right of the tribes to impose such a tax,[49] the lack of any mention of tribal severance taxes defeats the ar-

---

Indian Lands," discussed in similar terms the effect on tribal laws of a federal statute providing for the sale of reservation lots to non-Indians:

"[T]he legal right to purchase land within an Indian nation gives to the purchaser no right of exemption from the laws of such nation, nor does it authorize him to do any act in violation of the treaties with such nation. These laws requiring a permit to reside or carry on business in the Indian country existed long before and at the time this act was passed. And if any outsider saw proper to purchase a town lot under this act of Congress, he did so with full knowledge that he could occupy it for residence or business only by permission from the Indians." 23 Op. Atty. Gen., at 217.

In 1977, the American Indian Policy Review Commission noted that Indian tribes "do not both tax and receive royalties. Usually, they just receive royalties." AIPRC Final Report 344.

[49] The statute did authorize the collection of severance taxes by the States. Petitioners have argued that this authorization pre-empted any tribal power to impose a comparable tax. As recognized by the Court of Appeals, however, the legislative history indicates that Congress simply did not consider the question of tribal taxes on mineral output from reservation lands. 617 F. 2d 537, 547 (CA10 1980).

gument that all parties were aware as a matter of law that a severance tax could be imposed at any time as a condition to the continued performance of a mineral lease.

Thus, nothing in the leases themselves or in any Act of Congress conveyed an indication that petitioners could accept the rights conferred by the leases only by accepting a condition that they pay any subsequently enacted severance tax. Nor could such a condition be presumed from prior taxing activity of the Tribe. In my opinion it is clear that the parties negotiated the leases in question with absolutely no expectation that a severance tax could later be imposed; in the contemplation of the parties, the conditions governing petitioners' right to extract oil and gas were not subject to change during the terms of the agreements. There simply is no support for the proposition that the Tribe retained the power in the leases to impose an additional condition on petitioners' right to enter the reservation and extract oil and gas from reservation lands. Since that authority was not retained, the Tribe does not now have the power to alter unilaterally the terms of the agreement and impose an additional burden on petitioners' right to do business on the reservation.[50]

---

[50] The Secretary of the Interior argues that a license or franchise issued by a governmental body does not prevent the later imposition of a tax unless the right to tax "'has been specifically surrendered in terms which admit of no other reasonable interpretation.'" Brief for Secretary of Interior 13, n. 7 (quoting *St. Louis* v. *United R. Co.*, 210 U. S. 266, 280). See also *New Orleans City & Lake R. Co.* v. *New Orleans*, 143 U. S. 192, 195; *New York Transit Corp.* v. *City of New York*, 303 U. S. 573, 590–593. The principal issue in these cases cited by the Secretary was whether the retroactive imposition of a franchise tax violated the Contract Clause of the Constitution or was so fundamentally unfair as to constitute a denial of due process in violation of the Fourteenth Amendment. Although this argument was by no means frivolous, cf. *Puerto Rico* v. *Russell & Co.*, 315 U. S. 610, no such issue is raised here. These cases are distinguishable from the instant cases because Indian tribes do not have the same attributes of sovereignty as do States and their subdivisions. See *supra*, at 168–173.

In these cases, the Tribe seeks to impose a tax on the very activity that the leases granted petitioners the right to undertake.  As Solicitor Margold wrote long ago:

"Over tribal lands, the tribe has the rights of a landowner as well as the rights of a local government, dominion as well as sovereignty.  But on all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders, the tribe has the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business, provided only such determination is consistent with applicable Federal laws and *does not infringe any vested rights of persons now occupying reservation land under lawful authority.*"  55 I. D., at 50 (emphasis added).

Petitioners were granted authority by the Tribe to extract oil and gas from reservation lands.  The Tribe now seeks to change retroactively the conditions of that authority.  These petitioners happen to be prosperous oil companies.  Moreover, it may be sound policy to find additional sources of revenue to better the economic conditions of many Indian tribes.  If this retroactive imposition of a tax on oil companies is permissible, however, an Indian tribe may with equal legitimacy contract with outsiders for the construction of a school or a hospital, or for the rendition of medical or technical services, and then—after the contract is partially performed—change the terms of the bargain by imposing a gross receipts tax on the outsider.  If the Court is willing to ignore the risk of such unfair treatment of a local contractor or a local doctor because the Secretary of the Interior has the power to veto a tribal tax, it must equate the unbridled discretion of a political appointee with the protection afforded by rules of law.  That equation is unacceptable to me.  Neither wealth, political opportunity, nor past transgressions can justify denying any person the protection of the law.